**J.B. PARKER, Petitioner–Appellant,**

v.

**Harry K. SINGLETARY, Secretary, Florida Department of Corrections, Respondent–Appellee.**

**No. 90–3901.**

United States Court of Appeals, Eleventh Circuit.

Oct. 6, 1992.

Francis D. Landrey, Michael Aaron, New York City, for petitioner-appellant.

Celia A. Terenzio, Asst. Atty. Gen., West Palm Beach, Fla., for respondent-appellee.

Before TJOFLAT, Chief Judge, FAY, Circuit Judge, and CLARK, Senior Circuit Judge.

## PER CURIAM:

J.B. Parker was convicted and sentenced to death for the murder of a convenience store clerk that occurred on April 27, 1982 in Stuart, Florida. His conviction and sentence were upheld by the state courts on direct appeal[1] and in several post-conviction relief and habeas corpus proceedings.[2] The district court refused to grant habeas corpus relief on any of the issues raised by Parker.[3] We affirm the district court's denial of relief on all of Parker's claims.

Unless discussed otherwise, the district court found (and we agree) that Parker's claims necessary to a resolution of this appeal were exhausted and not procedurally defaulted in the state courts.

## I.

Parker argues that the district court erred in refusing to grant an evidentiary hearing. Parker claims that the state court evidentiary hearing on his first motion for post-conviction relief was not full and fair. After Parker filed his motion for post-conviction relief on December 3, 1987, the state court scheduled a hearing on Parker's motion for February 11, 1988. Due to the state court's error in incompletely addressing the hearing notice, Parker's counsel did not receive notice of the hearing until February 9, 1988. The state court refused to continue the hearing. Parker now argues that this refusal prevented him from fully developing evidence concerning the ineffectiveness of Parker's representation during the taking and admission of one of his statements and during the sentencing phase of the trial.[4]

We agree that through no fault of his own Parker was put in the unfortunate position of having to locate and schedule witnesses on two days' notice. Our review of the hearing that was held in the state court convinces us that Parker was nevertheless able to overcome his lack of notice. The hearing lasted for two days. During this time, Parker was able to call several witnesses as to the mitigation evidence that Parker's trial counsel could have presented. Parker produced one witness who testified concerning the circumstances of Parker's statement. Parker himself testified. Parker was able to introduce over twenty affidavits. The state called the prosecuting and defense attorneys, whom Parker was able to cross-examine. Also, the state court judge offered to hold a second hearing "[if] we are unable to finish the hearing because you have additional matters that you wish to present and you cannot have the witnesses here today or tomorrow."[5] Parker apparently never accepted the judge's offer.

■ Some evidence was taken on all of the issues raised by Parker. Moreover, ample evidence was in the record concerning Parker's statement, the primary issue upon which Parker seeks relief.[6] Given these circumstances, we conclude that Parker received a hearing in state court that was "full and fair."[7]

1. *Parker v. State,* 476 So.2d 134 (Fla.1985); *see also id.* at 135–37 (recounting events surrounding murder and trial).

2. *Parker v. State,* 542 So.2d 356 (Fla.1989); *Parker v. Dugger,* 550 So.2d 459 (Fla.1989).

3. R3–56 (district court opinion and order, Aug. 29, 1990).

4. *See* blue brief, at 17.

5. R2–17–Exh. 17, at 12.

6. *But cf. Streetman v. Lynaugh,* 812 F.2d 950, 958 (5th Cir.1987) ("[T]he facts regarding the voluntariness of Streetman's various statements were not adequately developed at the state evidentiary hearing.").

7. *Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963); *see Thomas v. Zant,* 697 F.2d 977 (11th Cir.1983) (discussing standards for obtaining evidentiary hearings under *Townsend* and 28 U.S.C. § 2254(d)); *cf. Smith v. Dugger,* 840 F.2d 787, 796 (11th Cir. 1988) (rejecting claim that time constraints on counsel prevented full and fair hearing in state court).

## II.

Parker's principal claim on appeal centers around the taking of his first statement by the police. Parker argues that his Fifth and Sixth Amendment rights to counsel were violated when the police took his statement without acceding to his repeated requests for counsel.

### A. *Facts*

Parker was apprehended by the police at 2:30 a.m. on May 5, 1982 and was brought to the State Attorney's Office in Fort Pierce, Florida for questioning.[8] He was taken to a small room by several detectives. The detectives played a tape of co-defendant John Earl Bush's confession, in which Bush stated that Parker shot the victim.[9] One of the detectives informed Parker that, in Parker's words, he "might as well go ahead and tell 'em about what happened cause he had it all on tape, they already know about it." [10]

Parker refused to make a statement at that time and started to leave the State Attorney's Office. While leaving, he saw his mother and other acquaintances. He believed they were attempting to obtain an attorney for him.[11] Before leaving or talking with his mother, Parker agreed to accompany a detective to the Martin County Sheriff's Office for further questioning.[12] Once there, Parker was arrested and placed in a cell.[13] Subsequently, a magistrate came to the cell to explain the charges to Parker, and Parker told the magistrate that he wanted to hire his own attorney.[14] This statement is supported by the magistrate's certificate of probable cause, dated May 5, 1982, which notes, "This Def. indicated he was going to try to hire his own atty!" [15] Afterwards, Parker was allowed to use the telephone to attempt to contact his mother to find out whether she had obtained an attorney for him. He could not contact her.[16] However, he spoke with his sister and asked her to find out about his mother's efforts to obtain an attorney.[17]

That afternoon Parker asked to see the Sheriff.[18] It is unclear whether Parker made this request in order to ask the Sheriff for permission to try to contact his mother again or whether Parker wanted to make a statement to the Sheriff. Sheriff James Holt did not allow Parker to call his mother, but brought him into a small room.[19] The Public Defender's Office had already entered an appearance for Parker at this time and had sent a letter asking the Sheriff's Office not to speak with Parker without contacting it first.[20] Sheriff Holt called Elton Schwarz, the Public Defender. Schwarz sent over Steven Greene, a student intern who had not been admitted to the bar, to consult with Parker. Schwarz had already determined that his office had a conflict in representing Parker (due to its representation of a co-defendant).[21] Schwarz therefore instructed Greene not to discuss the details of any possible statement with him but only to tell Parker not to confess if that was what Parker planned to do.[22]

---

8. Transcript of Evidentiary Hearing on Motion for Post–Conviction Relief, Feb. 12, 1988, R2–17–Exh. 18, at 195.

9. *Id.* at 197.

10. *Id.* at 196.

11. *Id.* at 198.

12. *Id.* at 199.

13. *Id.*

14. *Id.* at 200.

15. R2–17–Exh. 10, at 1550.

16. Transcript of Evidentiary Hearing on Motion for Post–Conviction Relief, Feb. 12, 1988, R2–17–Exh. 18, at 200.

17. *Id.* at 201.

18. *Id.* at 202.

19. *Id.* at 203.

20. R2–17–Exh. 10, at 1527.

21. *Id.* at 1534.

22. *See* Appendix to Defendant's Motion to Vacate Judgment and Sentences, R2–17–Exh. 24, at 501 (Greene deposition) ("Mr. Schwartz instructed me in connection with that meeting [with Parker] not to go into the facts of the case with Mr. Parker because the Public Defender's Office was conflicted and could not represent Mr. Parker.").

Greene arrived shortly, and Parker and Greene were left alone to talk. Parker testified, "[Greene] told me that he was sent over from the Public Defender's Office to represent me. And I told Mr. Greene—I asked Mr. Greene rather could I make a phone call cause I didn't know who he was until I be told, and I told him that I wanted to call my mother to see had she obtained a lawyer for me, which I told him this several times. And he told me that he was my attorney.... He also told me that I should not say anything...." [23] Greene did not mention his instructions from the Public Defender not to discuss the substance of any statement Parker might make or that Parker could be sentenced to death even if he was not the triggerman in the murder. [24] Parker testified that he would not have given a statement had he known these facts. [25]

Greene's deposition supports Parker's version of their conversation. Greene deposed:

During our private conversation, Mr. Parker told me several times that he wanted to call his mother in order to learn whether she had hired a lawyer for him. Mr. Parker appeared to have a specific lawyer in mind, and it was clear to me that he wanted that person to represent him, rather than myself. I understood from Mr. Parker that he had unsuccessfully asked the Sheriff for permission to call his mother and ask about the lawyer he believed she was retaining to represent him. [26]

However, the attorney who was eventually appointed to represent Parker testified that Parker never mentioned to him that he had called in the Sheriff to ask to use the telephone and that Parker had maintained that he had simply wanted to tell the Sheriff his side of the story. [27] The Sheriff testified at the suppression hearing that Parker had wanted to talk, but the Sheriff was not queried as to whether Parker also wanted to make a phone call to speak with his mother. [28]

After Parker and Greene finished their conversation, the Sheriff and other detectives returned. A tape-recorded transcript was made of the subsequent events and was played at Parker's trial: [29]

Holt: "This is Sheriff Holt, on May the 5th, 1982, at approximately 4:26 p.m. Just a few minutes ago I was summoned to the county jail by Art Jackson, who told me that an inmate by the name of Parker was requesting to see me right away. I come to the jail to see if Mr. Parker was sick, what his problem might be. At that time he told me he wanted to explain to me and to tell me exactly what went on in the Slater case. At that time I stopped him and told him that the Judge today had appointed the Public Defender to represent them; I had received notice in writing from the Public Defender's officer that I could not talk to him without notifying the Public Defenders. At that time he told me to notify them,

23. Transcript of Evidentiary Hearing on Motion for Post–Conviction Relief, Feb. 12, 1988, R2–17–Exh. 18, at 204.

24. *Id.* at 205.

25. *Id.* at 206.

26. Appendix to Defendant's Motion to Vacate Judgment and Sentences, R2–17–Exh. 24, at 502; *see also* Transcript of Evidentiary Hearing on Motion for Post–Conviction Relief, Feb. 11, 1988, R2–17–Exh. 17, at 117–18, 137.

27. Transcript of Evidentiary Hearing on Motion for Post–Conviction Relief, Feb. 11, 1988, R2–17–Exh. 17, at 84:

Q Why didn't you call the Defendant to the stand ... to explain to the Judge, "That I

really wanted an attorney and that I had asked my mother and I really wanted the Sheriff to come in just so I could get an attorney."

A Because that was contrary to what Mr. Parker had told me about the statement. His position was and what he told me and he never changed the position was that he wanted to talk to the Sheriff. He wanted to tell the Sheriff his side of the story.

28. *See* Transcript of Motion to Suppress, Sept. 3, 1982, R2–17–Exh. 1, at 8.

29. Parker has prepared a new transcription of the tape that he asserts to be more accurate than the trial transcript. Although we have quoted from the trial transcript in the text, we have footnoted where Parker's transcript materially differs.

that he still wanted to talk to me. I called the Public Defender's office and talked to Mr. Schwarz for a few minutes, told him the problem. About that time Mr. Greene come on the phone. I told Mr. Greene what was happening, and he says, 'I'll be right over.' A few minutes later Mr. Greene appeared at the jail, went back and talked to Mr. Parker alone, by himself. He come out and told me that he could not keep him from talking to me, the man still insisted on talking to me and telling me exactly what had happened, over his objection. And now we're in the nurse's examination room of the Martin County jail. Present is myself, Sheriff Holt, Deputy-sergeant Forte, detective department; Deputy-sergeant Miller, Martin County detective department; Public Defender Mr. Greene; and Mr. Parker. What is your first name."

Parker: "J.B."

Holt: "J.B. Parker. Mr. Greene, is there anything you want to put on this tape, just go ahead."

Greene: "Yes. Sheriff Holt, just for the record, Mr. Greene speaking, employed by the Public Defender's office in Stuart, Florida, and on behalf of Mr. Parker, who we have had a temporary appointment to just this morning from Judge Cianca, I would like to say on the record that Mr. Parker is now speaking to the detectives, or will be speaking to detectives from the sheriff's office in Martin County, and I have advised Mr. Parker not to speak to the officers, not to say anything to the detectives, not to say anything to anybody involved in this case. Over my objection Mr. Parker will be speaking on tape today to the sheriffs involved in this case. I have explained to Mr. Parker that anything that he says might and will be used against him in court. He has confirmed with myself, Mr. Greene, that he wants to go ahead and speak anyway and clear his conscience. I told him I didn't think it was a smart thing to do, he told me he wanted to speak anyway,

and therefore this interview is going forward even though it is over my objection."

Holt: "Thank you, Mr. Greene. Mr. Parker, I know you've been advised of your rights many, many times prior to this, but this is a rights form that I wish—I'll read it to you and you can read it, and I wish you would sign, before you make any statement of any kind."

Parker: "You say before?"

Holt: "Will one of you all read it, I don't have my glasses with me."

Forte: "Now, Mr. Parker, Detective Forte; I'm going to read you your rights form. Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to speak to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford an attorney, one will be appointed for you before questioning if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you speak to an attorney. Do you understand what I just read to you? Okay."

Holt: "Do you read, J.B.? Read it and sign it."

Forte: "I made an X over there, Mr. Parker, where I would like for you to sign it."

Holt: "J.B., that's not admitting to anything. That's advising you of your rights, and we want you to understand you do have—what rights that you do have, although your attorney is here present and he has explained it to you prior to this."

Greene: "Mr. Parker, do you understand those rights that you're reading now?"

Parker: "Yes."

Greene: "You understand what you're reading and what you're signing? Do you wish to go ahead and sign that?"

Parker: "I want to see if my mom got me a lawyer yet. I don't know, I ain't got in contact with her yet."

Greene: "Well, I'm acting as your attorney today."

Parker: "I just want to get this off my mind."

Holt: "Okay J.B., if you'll—"

Parker: "Talk."

Holt: "You go ahead and sign that before I ask you any questions. That's not admitting to anything, it's just that you understand what you have read there and what has been read to you."

Forte: "You see the X right there, Mr. Parker, where I made the X? Okay, sign your legal name, please."

Greene: "Do you understand that by signing that, you're waiving your right to remain silent?"

Parker: "Do I have to sign this to talk to you all?"

Holt: "No, sir. You can still talk to us without it."

Greene: "Well, you can—they want you to sign that there because it states right here that you're waiving your rights. Do you understand your rights here?"

Parker: "Yes, sir, the reason I was wanting one here." [30]

Greene: "Excuse me?"

Parker: "That is why I was wanting my lawyer. I want to see if my mom has a lawyer so I can have him with me." [31]

Greene: "Well, that's why I'm representing you today. Do you wish to make no statements until you get your mother to get another lawyer other than myself to represent you?"

Parker: "I was waiting on—I want my mom to get me a lawyer." [32]

Holt: "Okay, J.B.—"

Parker: "Another one."

Holt: "I think I understand where you're coming from. You asked me to come over and that's why I'm here. I went back and explained to you that you did have a lawyer appointed for you. Nobody is going to make you make a statement. You asked me could you talk to me and explain to me just exactly what happened, that you felt like that there was something being put on you that wasn't right. You wanted to tell me the story just like it was. Am I correct in that?"

Parker: "Yes, sir."

Holt: "Okay. You can still give me a statement without signing that. All that says right there is that you understand that you don't have to. Do you still wish to give us a statement at this time?"

Parker: "Yes, sir."

Holt: "Okay, we'll continue on with it now. The two detectives that are here will be, you know it's on tape, and they will be jotting down information as you come—talk to us. If you would in your own words just tell me what you want to tell me."

Parker: "I want to tell you I didn't kill that girl." [33]

The subsequent statement was introduced during the state's case-in-chief in the guilt phase of Parker's trial.

At his state court post-conviction relief hearing, Parker testified that he gave the statement "[b]ecause I asked Mr. Greene, I asked Sheriff Holt ... could I make a phone call and I ... never got any response to my question. And I felt that it was useless to go on asking questions. No one—no one would let me—allow me to make a phone call." [34] And Parker testified that the Sheriff's reference to Parker's feeling that "there was something being put on you that wasn't right" was the

---

**30.** "Right here sir, the reason I was wanting one here."

**31.** "Right here sir, the reason I was wanting a lawyer at this time. I want to see if my mom have me a lawyer so I can have him with me."

**32.** "I was waiting on—I was waiting on my mom to get me a lawyer."

**33.** R2–17–Exh. 5, at 774–80.

**34.** Transcript of Evidentiary Hearing on Motion for Post–Conviction Relief, Feb. 12, 1988, R2–17–Exh. 18, at 208.

immediate circumstance that prompted Parker to give the statement.[35]

Greene also deposed:

At the time that I attempted to explain to Mr. Parker that I was appointed to represent him, I believed that I was fulfilling the role assigned to me by the Public Defender. I now realize that, by asserting that I was his attorney, I may have contributed to the denial of Mr. Parker's right to an attorney of his choice, and his right to an attorney who would not be constrained by the conflict of interest with which I was presented. I may have misled Mr. Parker by telling him that I was representing him when the circumstances clearly indicated that he did not desire my services and was obviously trying to assert his right to some other attorney.[36]

On Parker's cross-examination at the post-conviction relief hearing, the state brought out the fact that, due to his prior brushes with the law, Parker was aware of the importance of having an attorney present.[37] The state pointed out that Parker did not inform his trial attorney of Parker's claim that the Sheriff refused his requests to make a telephone call.[38] Parker admitted that he had wanted to get the events of the crime off his mind.[39]

These facts indicate that Parker may well have initially contacted Sheriff Holt to request to call his mother about an attorney. This interpretation is certainly consistent with the statements Parker made in his taped statement. Parker simultaneously seems to have asked to tell his side of the story, which request is also consistent with the statement. However, even if Parker initially contacted Sheriff Holt *only* in order to make a statement, our precedents demonstrate that Parker's subsequent and repeated requests for a different attorney make the resulting statement inadmissible.

### B. *Law*

The admission of Parker's statement raises three questions for our consideration: (1) Did the presence of the intern Greene satisfy Parker's right to counsel when he gave the statement? (2) If not, did Parker sufficiently request to be represented by different counsel? and (3) If so, did Parker waive his right to counsel?

### 1. *The Effect of Greene's Presence*

 Parker argues that his right to an attorney under the Fifth and Sixth Amendments and *Miranda v. Arizona* [40] was violated by the taking of his statement by the Sheriff. An initial question we must address is whether the presence of the student intern Greene provided Parker all the counsel he was entitled to, whatever his requests for other counsel. Greene's presence creates a factual situation not covered precisely by prior cases.

Regardless of whether Parker's Sixth Amendment right to counsel had attached at the time of the statement,[41] Parker's

---

**35.** *See id.* at 209–10:

Q And where [the transcript] says later that ... Mr. Sheriff Holt is stated to have told you that you felt like there was something being put on you that wasn't right. How did you react to that statement?

. . . .

A It was the statement that Bush had made.
Q And how did that affect you?
A He asked me that question Bush's statement was the first thing that came to my mind.... And it was like that ... and from that point I stated yes sir. And he asked me another question and I believe I proceeded to tell him what happened that night.

**36.** Appendix to Defendant's Motion to Vacate Judgment and Sentences, R2–17–Exh. 24, at 503.

**37.** Transcript of Evidentiary Hearing on Motion for Post–Conviction Relief, Feb. 12, 1988, R2–17–Exh. 18, at 219.

**38.** *Id.* at 226.

**39.** *Id.* at 228; *see also id.* at 235–37.

**40.** 384 U.S. 436, 86 S.Ct. 1602 (1966).

**41.** This issue does not seem to have been addressed previously in this case. The state does not argue that Parker's Sixth Amendment right had not attached, and the evidence seems fairly clear that the right had attached, because Parker had apparently appeared before a magistrate prior to giving the statement. *See supra* text accompanying notes 14–15; *see also Fleming v. Kemp,* 837 F.2d 940, 948 (11th Cir.1988) (finding

repeated requests for counsel established his *Miranda*–Fifth Amendment right to counsel.[42] However, the counsel that was actually provided to Parker had not been admitted to the bar and was disqualified from representing Parker by his office's representation of a co-defendant. The fact that Greene was not a lawyer is a sufficient (if formalistic) reason to hold that Parker's Fifth Amendment right to counsel was not honored.[43]

Even if Greene is viewed as the practical equivalent of an attorney, he labored under a conflict that prevented him from giving Parker competent advice. Although the harm caused by a conflict of interest is typically difficult to measure because the harm "is in what the advocate finds himself compelled to *refrain* from doing,"[44] we have specific evidence of what Greene refrained from doing in this case. Schwarz, the Public Defender, told Greene not to discuss the facts of the case or the content of Parker's proposed statement with Parker. Greene abided by these instructions. Therefore, it was impossible for Greene to have known whether it was in Parker's interest to make a statement. If Parker was going to make a completely exculpatory statement, it might have been in his interest to talk. Moreover, Parker was clearly in need of legal advice: He almost surely did not know about the felony murder doctrine when he made his decision to admit that he participated in the robbery but did not actually murder. The state argues that Parker would have talked any-

way—that any other lawyer would have similarly advised Parker to keep silent—but Parker's repeated requests for another lawyer and the fact that Greene could not fully counsel Parker cast great doubt on this argument. Instead of Greene, the Public Defender's office might as well have sent a tape-recording of a voice saying, "Do not talk" to Parker, and the recording would no more have satisfied Parker's right to be counseled by an attorney. As the Supreme Court has remarked in the Sixth Amendment context, "[t]he mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters."[45] It is abundantly clear that there existed an actual conflict of interest in this case that had an adverse effect on Greene's performance.[46]

 Of course, it would have been possible for Parker to have waived his right to conflict-free counsel. "This court has held that a defendant may waive the right to conflict-free counsel as long as the waiver is knowingly and intelligently made. To be knowing and intelligent, the defendant must be told (1) that a conflict of interest exists; (2) the consequences to his defense from continuing with conflict-laden counsel; and (3) that he has a right to obtain other counsel."[47] But Parker was never informed that Greene had a conflict of interest that prevented his office from representing Parker. And Greene and Holt effectively told Parker that he did not

---

similar proceedings before a Justice of the Peace to be an "adverse judicial proceeding" and to initiate the Sixth Amendment right to counsel), *cert. denied,* 490 U.S. 1028, 109 S.Ct. 1764, 104 L.Ed.2d 200 (1989); *Witt v. Wainwright,* 714 F.2d 1069, 1073 (11th Cir.1983), *modified on other grounds,* 723 F.2d 769 (11th Cir.1984), *rev'd on other grounds,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). However, it is not necessary to the resolution of this case for us to determine whether a Sixth Amendment right had attached at the time of the statement to the Sheriff, because any Sixth Amendment violation would be subject to the same harmless error analysis we conduct below. *See infra* Part II.C.

**42.** *See infra* Part II.B.2. (discussing Parker's requests for counsel). p. 1572.

**43.** Greene never informed Parker that he was not an attorney, nor did Greene fulfill the written notice requirements of the intern program. *See* R3–56–23 (district court opinion).

**44.** *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978) (emphasis in original).

**45.** *Holloway,* 435 U.S. at 490, 98 S.Ct. at 1181.

**46.** *See generally Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (describing standard for relief in conflicted counsel cases); *McConico v. Alabama,* 919 F.2d 1543 (11th Cir.1990) (same).

**47.** *Duncan v. Alabama,* 881 F.2d 1013, 1017 (11th Cir.1989).

have the right to contact other counsel, by their repeated assertions that Greene was Parker's attorney. Parker therefore did not knowingly and intelligently waive his right to conflict-free counsel.

### 2. *Parker's Requests for Other Counsel*

■ Given that Greene's mere presence did not satisfy Parker's right to have counsel present when he gave the statement, we must determine whether Parker in fact requested different counsel. The Supreme Court has interpreted the Fifth Amendment (in *Miranda*) as requiring that all questioning must cease during a custodial interrogation when an accused asserts his right to counsel.[48]

The transcript of the statement reveals that Parker requested a different lawyer five times prior to making his statement.[49] Subsequently, the student Greene twice asserted that he was Parker's lawyer.[50] Finally, Sheriff Holt took over and told Parker that Greene was Parker's lawyer.[51] Holt then reminded Parker of the reason Parker wanted to talk, because "you felt like that there was something being put on you that wasn't right. You wanted to tell me the story just like it was." Parker gave a statement, but he never indicated that he wanted to give a statement without a different lawyer present, and he never signed the waiver of rights form that Sheriff Holt proffered him. Therefore, Parker clearly asserted his right to counsel.[52]

■ Even if Parker's five requests for different counsel could be said to be equivocal,[53] Sheriff Holt failed to clarify Parker's requests prior to continuing with the statement. "When a defendant makes an equivocal request for an attorney during a custodial interrogation, 'the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified.'"[54]

Although Greene initially attempted to clarify whether Parker wanted to wait to talk until another lawyer had been procured,[55] Holt's subsequent statements to Parker were not clarification but were argumentation. Parker stated that he did not regard Greene as his attorney and that he wanted "another one." Holt flatly asserted that Greene was Parker's attorney and continued the questioning. Holt's declaration did nothing to elucidate Parker's request and indeed confused Parker in the exercise of his rights.[56] In a somewhat comparable situation, we have noted that "the limited inquiry permissible after an equivocal request for legal counsel may not take the form of an argument between

---

**48.** *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

**49.** (1) "I want to see if my mom got me a lawyer yet. I don't know, I ain't got in contact with her yet." (2) "Yes, sir, the reason I was wanting one here." (3) "That is why I was wanting my lawyer. I want to see if my mom has a lawyer so I can have him with me." (4) "I was waiting on—I want my mom to get me a lawyer." (5) "Another one."

**50.** (1) "Well, I'm acting as your attorney today." (2) "Well, that's why I'm representing you today."

**51.** "I went back and explained to you that you did have a lawyer appointed for you."

**52.** *See Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir.1991) (holding that statement, "I think I should call my lawyer" was an unequivocal request for counsel); *Fleming*, 837 F.2d at 947 (holding that a defendant's assertion that he would get his own attorney rather than rely on an appointed one was an invocation of the right to counsel).

**53.** *Cf. Owen v. Alabama*, 849 F.2d 536, 539 (11th Cir.1988) (finding that statement that "I think I'll let y'all appoint me one" was at least an equivocal request for counsel).

**54.** *Id.* (*quoting Thompson v. Wainwright*, 601 F.2d 768, 771 (5th Cir.1979) (emphasis in original)).

**55.** "Do you wish to make no statements until you get your mother to get another lawyer other than myself to represent you?"

**56.** *See Christopher v. Florida*, 824 F.2d 836, 842 (11th Cir.1987) ("The rule ... permits 'clarification,' not questions that, though clothed in the guise of 'clarification,' are designed to, or operate to, delay, confuse, or burden the suspect in the assertion of his rights."), *cert. denied*, 484 U.S. 1077, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988).

interrogators and suspect...."[57] Moreover, Holt's not-so-subtle reminder that one of Parker's co-conspirators had implicated him may have intimidated Parker into foregoing the advice of counsel and giving the statement.[58] It is clear that Holt should have stopped the questioning to allow Parker to contact other, conflict-free counsel prior to continuing with the taking of the statement. This is because *Miranda* requires that, once the right to counsel has been exercised, "the interrogation must cease until an attorney is present."[59] Once an impartial attorney is present, we might add.

### 3. *Waiver of the Right to Counsel*

■ The district court denied relief in this case because it found that Parker had waived his right to counsel by giving the statement.[60] But the Supreme Court held in *Edwards*, "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."[61] And the district court seems to have confused the issue of whether there was a

knowing and intelligent waiver of rights with the issue of whether the statement was voluntary. The fact that Parker *voluntarily* gave the statement without different counsel does not at all mean that he *knowingly and intelligently* waived his right to conflict-free counsel.[62]

■ The inquiry that the district court should have conducted to determine whether a "knowing and intelligent" waiver of Fifth Amendment rights was made focuses on the suspect's comprehension of the rights he is relinquishing. The Supreme Court has written,

> The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing

57. *Thompson,* 601 F.2d at 772.

58. *See Towne v. Dugger,* 899 F.2d 1104, 1110–11 (11th Cir.) ("[The officers] admit that they did nothing to clarify whether Towne wanted to have an attorney present.... Instead, [one officer] further intimidated Towne by making accusatory statements...."), *cert. denied,* — U.S. ——, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); *United States v. Cherry,* 733 F.2d 1124, 1131 (5th Cir.1984) ("[A]fter Cherry had made an equivocal request for counsel, Cherry did not volunteer his confession; rather, he responded to questions posed by his interrogators. In *Thompson* the questioners ... improperly us[ed] a discussion of the right to counsel as a means to elicit an incriminating statement. Here, the agents exceeded the transgression in *Thompson* by asking Cherry about the murder itself to coax a confession from Cherry.").

59. *Miranda,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694.

60. *See* R3–56–19 ("The Court finds that when the petitioner seemed to hesitate and request to speak with his mother, the sheriff stopped asking petitioner to sign a waiver form, told him

that no one would make him give a statement, and inquired as to whether he actually wanted to make a statement. Petitioner indicated that he did want to make the statement and went ahead and told his side of the story. The Court finds that petitioner voluntarily and freely made his statement. The Court finds that petitioner made a knowing, intelligent, and voluntary waiver of his right to remain silent.").

61. *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1884–85 (footnote omitted).

62. *See Edwards,* 451 U.S. at 482, 101 S.Ct. at 1884 ("[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege...."); *Miller v. Dugger,* 838 F.2d 1530, 1538 (11th Cir.) ("The Supreme Court [in *Edwards* ] could not have stated more clearly that an uncounselled statement must be both voluntary and made after a knowing and intelligent waiver of the *Miranda* rights to be admissible."), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988); *see also United States v. Gaddy,* 894 F.2d 1307, 1312 (11th Cir.1990); *Dunkins v. Thigpen,* 854 F.2d 394, 398–99 (11th Cir.1988), *cert. denied,* 489

and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.[63]

In this case, Parker never signed the waiver of rights form offered to him by Sheriff Holt, nor did he otherwise indicate that he was knowingly and intelligently waiving his rights. Parker did not know of Greene's status or the limitations of his representation. Indeed, Sheriff Holt and Greene misrepresented Greene's true status to Parker. Under these circumstances, Parker could not have knowingly and intelligently waived his Fifth Amendment right "to talk only with counsel present."[64]

Because Greene's presence did not satisfy Parker's right to counsel, because Parker clearly did request other counsel, and because Parker did not knowingly and intelligently waive his right to conflict-free counsel, the resulting statement was inadmissible.

## C. Harmless Error

Our conclusion that Parker's statement was taken in violation of his Fifth Amendment right to counsel requires us to decide whether the admission of the statement was harmless error.[65] We find that the effect of the error was harmless beyond a reasonable doubt.

### 1. Presumed Prejudice

■ As an initial matter, we address Parker's argument that prejudice must be presumed as a consequence of his representation by conflicted counsel.[66] Parker makes this argument as part of a separate claim concerning the effectiveness of Greene's representation.[67] The district court found that this claim was only exhausted as part of other claims in the state courts.[68] Assuming Parker's Sixth Amendment right to counsel had attached,[69] because Greene only represented Parker for the brief period of time surrounding the taking of Parker's first statement, we find that it is not appropriate to consider this argument as a separate claim for ineffective assistance of counsel. As opposed to the typical claim of deficient overall trial assistance arising out of a conflict in counsel's representation, it is simple to determine the precise prejudice that arose from Greene's fleeting but conflicted representation: the improper admission of Parker's statement to the Sheriff.[70] We therefore refuse to presume prejudice as a result of Greene's ineffective assistance.[71]

### 2. Guilt Phase

■ Whether the admission of the statement was harmless error at the guilt

---

U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989).

63. Colorado v. Spring, 479 U.S. 564, 574, 107 S.Ct. 851, 857–58, 93 L.Ed.2d 954 (1987) (citations omitted).

64. Id., 479 U.S. at 574, 107 S.Ct. at 857; cf. Thompson, 601 F.2d at 770–72 (finding Miranda violation where police misled suspect as to the consequences of talking to an attorney).

65. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."); Null v. Wainwright, 508 F.2d 340, 343 (5th Cir.) ("Though some rights are so basic that their violation does not admit of harmless error treatment, the Fifth Amendment as embodied in Miranda's procedural safeguards is not one of them." (footnote omitted)), cert. denied, 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975).

66. See Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984) ("[P]rejudice is presumed when counsel is burdened by an actual conflict of interest. . . . Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" (citation omitted)).

67. See blue brief, at 34 ("Point III: The Public Defender Deprived Parker of His Sixth Amendment Right to Non–Conflicted Counsel and Effective Counsel").

68. See R3–56–19–24.

69. See supra note 41.

70. See supra text accompanying note 44.

71. It is unnecessary for us to address Parker's additional argument that he was actually prejudiced by Greene's representation. The Strickland v. Washington prejudice test essentially

phase of the trial is a difficult question. Much of the state's case rested on Parker's three statements. The first is the original statement now at issue; the second is the statement Parker made to the police when he agreed to show them where the body of the victim was deposited;[72] and the third is the confession Parker made to the girlfriend of one of Parker's co-defendants. (Parker also testified at trial and admitted to being in the company of the others and going into the store, but we do not believe that he would have testified but for the introduction of the first statement.)

The original statement was quite complete. The statement described the actions of the defendants as they drove around the vicinity of Stuart, Florida. Parker claimed that, when he first learned that co-defendant Bush wanted to rob a store, he protested and asked to be taken home. When Bush challenged Parker, however, Parker stated, "I don't call myself no chicken, man."[73] Parker stated that the co-defendants went to the victim's convenience store twice, but that they did not rob during the first visit. Parker stated that Bush had said that he planned to kill the clerk when they stopped the first time.[74] Parker also fully described the victim's reactions during her abduction and murder.[75]

Parker was asked during the taking of his first statement whether he would be willing to show the police where the knife used to stab the victim was thrown, and Parker assented (over Greene's objection).[76] On May 7, 1982, two officers drove Parker out to the murder scene, and Parker gave a second statement. It is unclear whether the officers initiated the May 7 contact with Parker.[77] Parker signed a waiver of rights form before leaving with the officers. Parker showed where "they" had taken the victim out of the car and stated that co-defendant Bush stabbed and shot her.[78] He showed the officers where the knife had been thrown from the car. He indicated where the police had stopped the car after the murder and that the defendants had considered shooting the deputy. He showed where the defendants went to hide the gun and where the defendants split up the money; Parker received between twenty and thirty dollars.[79] Afterwards, he was dropped off at his house. Neither of the officers made any contemporaneous notes of this second statement, and nothing was written down until ten days after the statement.[80] The second statement thus focused almost exclusively on the events after the murder; the second

merges into the harmless error analysis we conduct on the statement issue.

**72.** Parker argues on appeal that this second statement was also taken in violation of his right to counsel. *See* blue brief, at 23 n. 13. However, the state argued before the district court that this claim was procedurally defaulted because it was not raised on direct appeal. *See* R2–39–7–8. In reply, Parker argued that the claim was adequately raised on direct appeal when he challenged the admission of the first statement. *See* R2–40–7 n. 4. Parker further stated, "If, however, this Court were to conclude that Parker's claim with respect to the [second statement] is unexhausted, Parker will voluntarily waive that claim." *Id.* The district court did not discuss the issue of the second statement. Our review of Parker's brief on direct appeal indicates that Parker failed to raise this issue in any form. *See* R1–2–App. 7 (direct appeal initial brief); R1–2–App. 8 (direct appeal reply brief). Parker thereby abandoned his objections to the second statement and is procedurally barred from challenging its admission in federal court. *See generally Presnell v. Kemp,* 835 F.2d 1567, 1574–75 (11th Cir.1988) (discussing rationale underlying "abandoned objection" pro-

cedural default rule), *cert. denied,* 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989).

**73.** R2–17–Exh. 5, at 782.

**74.** *Id.* at 791 ("[Bush] said that first time he stopped somewhere, he said, 'I'm going to kill her, I'm going in there and I'm going to kill her. I'm going to get her in the car and take her off and I'm going to kill her. You all ain't going to have nothing to do with it,' just like that there.").

**75.** *Id.* at 783, 785, 790.

**76.** *Id.* at 785.

**77.** *Id.* at 795.

**78.** *Id.* at 798.

**79.** R2–17–Exh. 6, at 803.

**80.** *See generally* testimony of Officer Powers, R2–17–Exh. 5, at 794–99, R2–17–Exh. 6, at 801–36; testimony of Officer Vaughn, R2–17–Exh. 6, at 836–48.

confession contained no details of the events leading up to and during the murder.

The third statement was a confession made to Bush's girlfriend, Georgeanne Williams, who testified that she went to visit Bush on May 8, 1982, at the jail. She said that she was allowed into the cell area alone to speak with Bush and that she thereafter went across the hall to speak with Parker. She claimed that Parker's door was loose and that she could talk to him through the keyhole. Williams testified that she asked Parker who shot the victim, and Parker said, " 'I shot [the victim] and [Bush] stabbed her.' And [Parker] said if I [Williams] mentioned it, it would be my word against [Bush's]. He said that [Bush] already had a past record, it would be on him, anyway." [81] This was the entire extent of the third statement. On cross-examination, Williams admitted that she had met Parker only once prior to this confession, that Bush had asked her to marry him, that she visited Bush every day he was in jail, and that she had lied to her parents as to Bush's past record.

The other evidence linking Parker to the murder was not great. No weapon with Parker's fingerprints was introduced. One witness identified Parker as being in the store earlier in the evening of the murder. [82] Another witness testified that he saw the four defendants together in Fort Pierce earlier in the year. [83] And one witness testified that he saw Parker's co-defendant Bush (along with unidentified others) in the store at the time of the robbery. [84]

The jury could have convicted Parker of either premeditated murder or felony murder. The jury's verdict did not indicate whether they believed that Parker actually committed the murder or instead whether they believed someone else committed the murder but that Parker had engaged in the commission of the felonies underlying the murder. [85] However, as Parker's original statement only supported a theory of felony murder, we need only determine whether there was sufficient other evidence to support that theory to render admission of that statement harmless.

Parker's second statement to the police, although not as detailed as the first, was essentially a complete confession to participation in the underlying felonies and therefore also supported the state's felony murder theory. In addition, there was testimony from a witness who had seen Parker in the victim's store earlier in the evening, when Parker had apparently cased the store for the eventual robbery. Clearly, there was sufficient evidence to support Parker's conviction under a felony murder theory, even without Parker's original statement. Upon review of the record, we are convinced that the defendant suffered no prejudice from the admitted evidence. Accordingly, we find that the introduction of Parker's first statement during the guilt phase of his trial was harmless beyond a reasonable doubt. [86]

### 3. Sentencing Phase

 We also find that the introduction by the state of Parker's first statement during the sentencing phase was harmless error. Although parts of the statement

---

81. Testimony of Georgeanne Williams, R2–17–Exh. 6, at 883.

82. R2–17–Exh. 4, at 512.

83. R2–17–Exh. 5, at 615.

84. R2–17–Exh. 4, at 537.

85. See judge's charge to jury, R2–17–Exh. 7, at 1181–82.

86. See Miller, 838 F.2d at 1540 (finding admission of confession harmless as to guilt; "[The defendant's] statement told the jury only what

the police already knew or what other witnesses would relate.... Furthermore, the police had one piece of evidence that clinched the issue as to Miller's factual guilt...."); Martin v. Wainwright, 770 F.2d 918, 933 (11th Cir.1985) (finding admission of confession in violation of Miranda harmless error; "The most important factor in our decision is that the [improperly admitted] confession was merely cumulative of the evidence contained in the [properly admitted] confession. In fact, the [properly admitted] confession included a far more detailed description of the murder than did the [improperly admitted] confession." (footnote omitted)), cert. denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).

were damaging to Parker, overall the statement was highly exculpatory. He told of his continual objections to the planned robbery and that he asked to be taken home. He recounted the pressure put upon him by the shooting her or injuring her in any way. The statement showed that Parker was remorseful, upset about what had happened, and wanted everyone to know he had not done it.[87]

Indeed, this statement by Parker, given soon after his arrest and followed by his cooperation with the authorities in going to the scene to look for the weapon and confirming where the body of the victim had been placed, gave his counsel perhaps the strongest ammunition he had to argue against imposition of the death penalty. In our opinion, if the state had not offered the statement in evidence, effective defense counsel would have offered it at sentencing. Under these circumstances, we cannot see that Parker was prejudiced by introduction of his first statement, and find that its introduction at sentencing was harmless beyond a reasonable doubt.[88]

### III.

■ Parker maintains that the state's failure to disclose at his trial its inconsistent "triggerman" theories violated his due process rights and that his trial counsel was ineffective for failing to capitalize upon this inconsistency. Parker claims that the state argued at three of the co-defendants' trials (those of Bush, Cave, and Parker) that that co-defendant pulled the trigger. Parker was the last co-defendant to be tried, and the state did not disclose this potentially exculpatory information to him. Parker argues that this failure to disclose prevented him from presenting evidence that the prosecution itself had doubts as to the identity of the triggerman in this case.

The district court found that, taken as a whole, the prosecutors' arguments in the Bush and Cave cases were meant to convince the jury that the defendants were guilty of first degree felony murder.[89] Parker is nevertheless correct that both the Bush and Cave prosecutors at some point contended that Bush and Cave actually fired the weapon that killed the victim. Bush's prosecutor made the following statement in his closing argument:

> This is a .38 Special. This is a live round. [This photograph] is what happens when a live round is fired by John Earl Bush and smashes into the skull of Frances Julia Slater.[90]

Cave's prosecutor argued:

> [T]he only statement you have that [Cave] didn't pull the trigger was his own self-serving statement, that after he heard Bush's statement implicating him, "I better make the best possible statement now on my own behalf"—he's the only one at that point that tells you he didn't pull the trigger.
>
> Who had the gun from the beginning? Alphonso Cave. Who had the gun in the store? Alphonso Cave. Who put her in the back seat? Alphonso Cave. Who took her out of the back seat? Alphonso Cave. Who had the gun? And who was outside with Frances Slater? Alphonso Cave.[91]

To support his due process claim, Parker relies heavily on the Supreme Court case of *Green v. Georgia*[92] and on a special concurrence in the en banc case of *Drake v.*

---

87. R2–17–Exh. 5, at 780–93.

88. Parker also raises several other issues as to sentencing which we find are without merit.

89. R3–56–45 ("When read in its entirety, the State's closing argument in the Bush case shows that the State did not have the evidence to prove that Bush was the shooter. Rather, the State throughout reviewed the evidence for the jury explaining that it was sufficient to convict him of felony murder."); *id.* at 48 ("The Court ... finds from the evidence presented at Cave's trial, as well as from the prosecutor's closing argument taken as a whole, that the State was clearly demonstrating at Cave's trial that he should be convicted of first-degree felony murder.").

90. R1–4–App. 45, at 992–93.

91. R1–4–App. 46, at 651–52.

92. 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979).

*Kemp.*[93] In *Green*, the Georgia courts had refused to admit exculpatory hearsay testimony from a witness who had given the same testimony but instead had appeared for the prosecution in a co-defendant's previous trial. The Supreme Court reversed, holding that the exclusion of the evidence prevented Green's sentencing jury from hearing all relevant mitigating evidence.[94] In *Drake*, two defendants were convicted for the same murder in separate trials. The state had contended at the first defendant's trial that the first defendant had actually killed the victim. The first defendant testified at his trial that he did not participate in the murder and accused the second defendant of being the perpetrator. One year later, the state used the testimony of the first defendant to show that the second defendant had actually killed the victim. The concurrence concludes that the prosecutor had obtained the second conviction through the use of evidence that he could not have believed, given that the prosecutor had disputed the first defendant's testimony in the first trial.[95]

One crucial difference between Parker's case and the facts of *Green* and *Drake* is that Parker's prosecution did not involve the use of necessarily contradictory evidence. In all three cases, there was little physical evidence as to which defendant actually committed the murder. In *Green*, the state court excluded exculpatory evidence that the state had relied upon in a co-defendant's trial. In *Drake*, the reverse held true: inculpatory evidence that the state had discredited in a previous trial was used as essential support for the state's case. But in Parker's case, Parker was not prohibited from making use of exculpatory evidence that had been used to convict his co-defendants; neither did the prosecution use evidence it discredited in Parker's co-defendants' trials to show that Parker was the triggerman. Due to the lack of evidence, the only inconsistency was in the state's alternative arguments.

Parker makes the argument that the failure to disclose the inconsistency violated "his due process right to have the jury at his trial take into account—both in determining his guilt or innocence and in deciding whether to recommend a sentence of death—that the [S]tate had previously contended that someone other than Parker fired the shot that killed Ms. Slater." [96] But no due process violation occurred, because there was no necessary contradiction between the state's positions in the trials of the three co-defendants. Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendants' cases to argue alternate theories as to the facts of the murder. The issue of whether the particular defendant on trial physically committed the murder was an appropriate question for each of the co-defendants' juries. Moreover, the second circuit has forbidden the evidentiary use of prior jury argument in federal court under similar circumstances.[97] The state's mere failure to disclose the alternate positions it had taken in the trials of the other co-defendants thus did not result in a due process violation. For the same reasons, Parker's

**93.** 762 F.2d 1449, 1478–79 (11th Cir.1985) (en banc) (Clark, J., specially concurring), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986).

**94.** *See Green*, 442 U.S. at 97, 99 S.Ct. at 2151 ("The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability.... Perhaps most important, the State considered the testimony sufficiently reliable to use it against [a co-defendant], and to base a sentence of death upon it." (citations and footnote omitted)).

**95.** *See Drake*, 762 F.2d at 1479; *see also id.* ("[T]he prosecution's theories of the same crime in the two different trials negate one another. They are totally inconsistent. This flip flopping of theories of the offense was inherently unfair.").

**96.** Grey brief, at 12–13.

**97.** *See United States v. McKeon*, 738 F.2d 26, 33 (2d Cir.1984) ("[W]e circumscribe the use of prior jury argument. Before permitting such use, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial. *Speculations of counsel*, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case *or invitations to a jury to draw certain inferences should not be admitted.*" (emphasis added)).

trial counsel was not ineffective for failing to discover and make use of the state's inconsistent statements.

## IV.

■ Parker maintains that he was denied his Sixth Amendment right to confront the witnesses against him when the prosecutor made reference to co-defendant Bush's statement implicating Parker.[98] Over objection, the prosecutor stated during closing argument that Parker gave his statement because "[h]e found out that [Bush] told law enforcement who actually shot Frances Julia Slater."[99] And, "I submit to you that the only reason that ... J.B. Parker called for Sheriff Holt, is because he found out what John Earl Bush told law enforcement regarding the killing."[100]

The district court found that these statements were logical inferences drawn from the evidence, since Parker acknowledged during his first statement that he was giving the statement because "something was being put on" Parker and since Parker stated during his first statement and during cross-examination that Bush had said that "everything would fall on" Parker if he confessed.[101]

Parker argues that the information contained in the prosecutor's statements was not in evidence. We disagree. First, Parker contends that the sheriff, not Parker, stated that Parker had been accused of complicity in the victim's murder. Regardless of who made the assertion that Parker had been accused, the fact of the accusation was nevertheless in evidence. Second, Parker points out that his statements concerning Bush's threat to accuse him referred to a statement Bush made prior to their arrest, not to Bush's confession. But we agree with the district court's conclusion that the prosecutor could logically infer from (1) Bush's pre-arrest threat to implicate Parker and (2) Parker's post-arrest knowledge or suspicion that someone had implicated him that (3) Bush had carried out his threat to implicate Parker. The prosecutorial statements were fair comment on the evidence.[102]

■ Even assuming *arguendo* that a Confrontation Clause violation occurred, the error was harmless beyond a reasonable doubt.[103] As we discussed more fully in part II. of this opinion, the prosecution introduced two valid statements during Parker's trial, one of which implicated Parker as the triggerman. Parker is not due relief on this issue.

## V.

■ Parker asserts that the prosecutor violated *Swain v. Alabama*[104] when he

**98.** *See, e.g., Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965) ("[P]etitioner's inability to cross-examine [a non-testifying co-defendant who had been tried separately] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause.").

**99.** R2–17–Exh. 7, at 1154.

**100.** *Id.* at 1156.

**101.** *See* R3–56–58 ("It is logical, under the circumstances here, to infer that the petitioner made his statement to the sheriff because he either knew, or suspected, that one of his codefendants made a statement implicating him in the murder. It is fair to infer that Bush made a statement pointing the finger at one of the other participants in the crime. The Court finds that the statement was within the evidence before the jury." (footnote omitted)).

**102.** *See United States v. Dady*, 536 F.2d 675, 678 (6th Cir.1976); *cf. Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir.1983) ("The prosecutor clearly went outside the record of this case when he explained to the jury that there was an eyewitness informant who told the police that Hutchins was the perpetrator of the crime."), *cert. denied*, 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984).

**103.** *See, e.g., Dutton v. Evans*, 400 U.S. 74, 90, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970) (Blackmun, J., concurring) ("The single sentence attributed in testimony by [one witness] to [a codefendant] about Evans, and which has prolonged this litigation, was, in my view and in the light of the entire record, harmless error if it was error at all.").

**104.** 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Because Parker's conviction was final prior to the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the holding in *Batson* does not apply to Parker's case. *See Love v. Jones*, 923 F.2d 816, 818 n. 2 (11th Cir.1991).

struck all four of the black prospective jurors.[105] After the second and third strikes, Parker's trial attorney objected. The prosecutor refused to provide any rationale for his strikes. After the fourth strike, Parker's attorney objected again. This time, the prosecutor stated that he struck the fourth black prospective juror for several reasons:

> Number one, I thought she indicated that it would be a hardship for the person that she was caring for. He was an invalid, if she served on the jury. Number two, I determined that she did not like capital punishment, that she was not—did not qualify as a cause challenge but it would still enable us to exercise peremptory challenge based upon her feelings regarding capital punishment and number three, the third reason after she indicated she understood everything. She, obviously, was undecided according to her answers, even though [defense counsel] was questioning her. So, conditioned upon that, I recommended to [the other prosecutor], that we exercise our peremptory challenge and for that reason and for no other.[106]

The prosecutor later gave a further and more general justification for his strikes:

> I have never at any time ever mentioned to anybody, to excuse any juror for any reason, whether race, creed or color when we are trying a case. They ... have separate reasons. We excuse jurors for the way they answer, peremptor[i]ly, the way they answer questions, their attitude, their demeanor, many, many things and unfortunately in this case as we said, we have excused nine now. Four of which were black and five were white. And we had just cause for every one of them. Race had nothing to do with it.[107]

The trial court refused to declare a mistrial due to the strikes. Parker was ultimately convicted by an all-white jury of killing a white woman.

This court has held, "Under *Swain*, a prosecutor's use of peremptory challenges to exclude blacks from a jury violates the equal protection clause of the Fourteenth Amendment only where a systematic striking of blacks from the jury can be shown in 'case after case, whatever the circumstance, whatever the crime and whoever the defendant or the victim may be.'"[108] However, Parker has not shown any such systematic pattern of exclusion of black potential jurors by the prosecutor. But if a prosecutor voluntarily places his reasons for peremptory challenges on the record, then those reasons should be reviewed for evidence of discrimination:

> Cases where the prosecutor at trial volunteers his or her reasons for using peremptory challenges to exclude from the petit jury an identifiable group, present a situation distinguishable from *Swain*. In such cases, the court does not conduct the type of inquiry barred by *Swain*. The prosecutor's motives have been voluntarily put on the record and the prosecutor can no longer be cloaked by the presumption of correctness.[109]

---

**105.** The district court did not reach the question of whether this claim was procedurally barred and denied relief on the merits. *See* R3–56–77. On appeal, the state does not challenge Parker's claim as being procedurally barred. Accordingly, we address this issue on the merits. *See, e.g., Mayo v. Lynaugh*, 893 F.2d 683, 687 (5th Cir. 1990) (state's failure until petition for rehearing on appeal to present procedural default claim waived procedural default issue).

**106.** R2–17–Exh. 4, at 454–55.

**107.** *Id.* at 456–57.

**108.** *Love*, 923 F.2d at 818 (citation omitted).

**109.** *Weathersby v. Morris*, 708 F.2d 1493, 1496 (9th Cir.1983), *cert. denied*, 464 U.S. 1046, 104

S.Ct. 719, 79 L.Ed.2d 181 (1984); *see also Garrett v. Morris*, 815 F.2d 509, 513 (8th Cir.) ("[E]ven assuming that the prosecutor had no duty to justify his actions under *Swain*, by volunteering his reasons for striking the black jurors, he made those reasons part of the record subject to our review. He is no longer 'cloaked by the presumption of correctness,' and we may review his motives 'to determine whether the "purposes of the peremptory challenge are being perverted."'" (citations omitted)), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987); *cf. Batson*, 476 U.S. at 101 n. *, 106 S.Ct. at 1725 n. * (White, J., concurring) ("Nor would it have been inconsistent with *Swain* for the trial judge to invalidate peremptory challenges of blacks if the prosecutor, in response to an objection to his strikes, stated that he struck

■ Parker argues that the prosecutor opened the door to an inquiry as to his motives for striking all of the black prospective jurors by (1) providing his reasons for striking one black prospective juror [110] and (2) stating in general terms his possible motives for striking prospective jurors.[111] But generally stating possible motives is not the equivalent of stating particular motives for striking particular minority venirepersons. The prosecutor was not referring only to striking black prospective jurors but rather to the factors weighing into his decision to strike all jurors. A statement of general policy such as the one made by the prosecutor in this case does not lift *Swain*'s cloak of presumptive correctness. We will therefore consider Parker's equal protection claim only in reference to the single black prospective juror for whom the prosecutor gave reasons for striking.

■ The prosecutor gave three reasons for striking the fourth black venireperson. These reasons were that the venireperson (1) needed to care for an invalid; (2) expressed reservations about the death penalty; and (3) expressed confusion in some of her responses. Standing alone, these reasons do not appear to be pretextual. Although Parker argues that white prospective jurors who were not struck also expressed hesitancy as to the death penalty, hesitancy was not the only reason given for the strike of the fourth black prospective juror. Parker does not point us to a hesi-

tant, confused white venireperson confronted with a personal problem in serving as a juror who was not struck. Under the particular facts of this strike, no equal protection violation occurred.[112]

Parker also appears to argue that the Florida courts misapplied state law in rejecting his challenge to the empaneling of the jury. However, Parker does not explain in what way this error, if it took place, raises claims cognizable in federal court.[113]

## VI.

Finally, Parker argues that the transfer of his case from the Southern District of Florida to the Middle District of Florida constituted an abuse of discretion by the transferring judge, the Honorable Stanley Marcus, and that his case should be remanded (if necessary) to the Southern District. Both the Southern and Middle Districts had jurisdiction over the case, because Parker was indicted and formally sentenced in the Southern District and was tried and convicted in the Middle District.[114] Judge Marcus transferred the case to the Middle District because two of Parker's co-defendants had petitions for habeas relief pending in the Middle District, and because at least one of Parker's issues appeared to be similar to those raised by his co-defendants.[115] However, the co-defendants' petitions were heard by different Middle Dis-

blacks because he believed they were not qualified to serve as jurors, especially in the trial of a black defendant."). *See generally Walton v. Caspari*, 916 F.2d 1352, 1361 (8th Cir.1990) ("[W]e hold that *Garrett* 'did not announce a new rule because it was "merely an application of [existing] principle[s]," ' and therefore the district court did not err in holding that *Garrett* could be applied retroactively to Walton's case.") (citations omitted), *cert. denied,* — U.S. —, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991).

110. *See supra* text accompanying note 115.

111. *See supra* text accompanying note 116.

112. *Cf. Weathersby,* 708 F.2d at 1496–97 (analyzing prosecutor's volunteered reasons for striking prospective black jurors and finding no equal protection violation).

113. *See Wainwright v. Goode,* 464 U.S. 78, 86, 104 S.Ct. 378, 383, 78 L.Ed.2d 187 (1983) (per curiam) ("[M]ere errors of state law are not the concern of this Court, unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution." (citations and internal quotations omitted)).

114. *See Dobard v. Johnson,* 749 F.2d 1503, 1505 (11th Cir.1985) (construing 28 U.S.C. § 2241(d); "We hold that where substantial incidents of conviction and sentence are divided between two federal judicial districts, either district court is the court of conviction and sentence within the meaning of Sec. 2241(d) and has power to entertain the petition on its merits or transfer it.").

115. R1–16–5–6.

trict judges,[116] and at the time of the transfer one of the co-defendants' petitions had already been dismissed.[117]

 The question for this court is whether the transfer adhered to the dictates of 28 U.S.C. § 2241(d), which states in pertinent part:

> The district court for the district wherein [a habeas corpus] application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

Parker argues that the transfer was not "in furtherance of justice," because many of the witnesses he wished to present would be greatly inconvenienced by travel to the Middle District from the Southern District, where the crime was committed. We agree that district courts should avoid the temptation to transfer habeas petitions without giving careful consideration to the

convenience of witnesses.[118] However, the abuse of discretion, if any, is nullified by this court's determination above that no evidentiary hearing was required. And strong considerations of judicial economy dictate that this case be remanded to the Middle District of Florida, the court that is already intimately familiar with Parker's claims.

### VII.

Because we find no merit in any of Parker's claims, the district court's judgment is AFFIRMED.

116. R4–20.

117. *Id.* at 8.

118. *See Mitchell v. Henderson,* 432 F.2d 435, 436 (5th Cir.1970) ("The purpose of [section 2241(d) ], of course, is to provide a more convenient forum for witnesses.").