476 So.2d 134 (1985)
J.B. PARKER, Appellant
v.
STATE of Florida, Appellee.
No. 63177.
Supreme Court of Florida.
August 22, 1985.
Rehearing Denied October 28, 1985.
*135 Robert G. Udell, Stuart, for appellant.
Jim Smith, Atty. Gen. and Lydia M. Valenti and Richard G. Bartmon, Asst. Attys. Gen., West Palm Beach, for appellee.
OVERTON, Justice.
The appellant, J.B. Parker, was convicted of the first-degree murder of a convenience store clerk, in addition to kidnapping and robbery with a firearm. In accordance with the jury's recommendation, the trial judge imposed the death sentence for the first-degree murder. He also imposed consecutive ten-year sentences for the kidnapping and the robbery. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and we affirm the convictions and the imposition of the death sentence.
The essential facts are as follows. On April 27, 1982, the 18-year-old victim was working the late shift in a convenience store in Stuart, Florida. The appellant and his codefendants, John Earl Bush, Alfonso Cave, and Terry Wayne Johnson, had set out in Bush's car from Fort Pierce to West Palm Beach. Appellant's taped statement reflects that, during the course of the trip, Bush told the appellant, "We're going to rob something." Later, Bush and Cave went into the convenience store where the victim was working, after previously visiting the store to stake it out. Bush and Cave took the money and the woman, placing her in the back seat of the car. The victim pleaded, "You aren't going to hurt me," and Bush responded, "Man, I'm going to kill this bitch. I done been to prison for six years and I ain't going back, 'cause this whore going to identify us." At an isolated *136 location the victim was dragged out of the car by her hair. During the course of the 20-minute trip, the victim had pleaded that she not be hurt. At trial, Bush's girlfriend testified that, after the victim was removed from the car, Bush stabbed her and the appellant shot her. The victim apparently sank to the ground in a kneeling posture after being stabbed and was shot in the back of the head, execution-style, from a distance of approximately two feet. Medical testimony established that the gunshot  not the stabbing, which was a two-inch shallow wound  killed the victim. The appellant and the codefendants then drove back to Fort Pierce and split the money four ways, the appellant receiving twenty to thirty dollars.
A few days after the victim was found, the codefendant Bush made a statement to the police implicating Parker along with the other codefendants. The appellant was arrested and taken to the Martin County jail where, aware that Bush had made a statement, he advised a jailer that he wanted to talk about the case. The jailer told the appellant that he could not talk to him, and that appellant had to talk to his attorney. The appellant responded that he did not want to talk to his attorney, but indicated that he wanted to talk to the sheriff. The sheriff also told appellant that he could not talk to him and that counsel had been appointed to represent him. The sheriff called the public defender's office, which sent a representative to the jail who advised the appellant not to say anything. Notwithstanding this advice, appellant stated that he wanted to go ahead and speak anyway to clear his conscience and to tell them that he did not kill the girl. The sheriff repeatedly advised appellant that a lawyer had been appointed to represent him and that nobody was going to force the appellant to make a statement. In response, Parker advised the sheriff that he still wanted to make a statement. In his statement, appellant denied participating in the killing and stated that Bush both stabbed and shot the victim. The appellant later retraced with law enforcement officials the route he and the codefendants had taken and showed them where they had taken the victim out of the car and where they had put the body.
The evidence also reflects that Bush's girlfriend, Georgeanne Williams, went to visit Bush in jail, during which time she also visited Parker. She testified concerning her conversation with Parker as follows:
Williams: I asked him what had happened. He said, "Didn't John [Bush] tell you." I said, "No, John didn't tell me anything." I said, "I just want to know who shot the girl, that's all."
Prosecutor: Okay. And after you told J.B. Parker you just wanted to know who shot the girl, what did J.B. Parker tell you, Georgeanne?
Williams: He told me, he said, "I shot her and John stabbed her." And he said if I mentioned it, it would be my word against his. He said that John already had a past record, it would be on him, anyway.
Williams recited Parker's admission to her mother and sister and they in turn testified about that fact at the trial. The defendant testified on his own behalf and denied participation in the killing. The jury returned a verdict of guilty of first-degree murder, in addition to kidnapping and robbery with a firearm.
In the penalty phase, Parker presented testimony of a clinical psychologist who testified that, in his opinion, Parker was a passive or non-aggressive type of individual. On cross-examination, it was brought out by the state that the appellant had a juvenile record of breaking and entering into schools. By a vote of eight to four, the jury recommended the imposition of the death penalty. In accordance with the jury's recommendation, the trial judge imposed the death penalty. In so ruling, the trial judge found five aggravating circumstances: (1) the defendant was previously convicted of a delinquent act involving the use or threat of violence to a person; (2) the capital felony was committed while the defendant was engaged in the commission *137 of a kidnapping and robbery; (3) the capital felony was committed for pecuniary gain; (4) the capital felony was especially evil, wicked, and cruel; and (5) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. As mitigating circumstances, the trial judge found that the victim was not sexually molested; the defendant was of a young age (19) at the time of the offense; and the defendant's behavior at trial was acceptable.
The codefendants Bush and Cave were also convicted of first-degree murder and both received the death penalty. This Court affirmed Bush's conviction and sentence in Bush v. State, 461 So.2d 936 (Fla. 1984). Cave's appeal of his conviction and sentence is presently before this Court on direct appeal.

Guilt Phase
The appellant challenges his conviction on five grounds. First, appellant asserts that the trial court erred by allowing the state, over appellant's objection, to introduce into evidence the testimony of the witness Williams' mother and sister to show that the statements made to them by Williams regarding appellant's admission of guilt were consistent with Williams' testimony at trial. It is argued that the admission of the testimony of the sister and mother violated the general rule in Florida that a witness's testimony may not be corroborated by his own prior consistent statement. Van Gallon v. State, 50 So.2d 882 (Fla. 1951); McRae v. State, 383 So.2d 289 (Fla. 2d DCA 1980). The appellant recognizes that the Florida Evidence Code contains certain exceptions to this rule. Section 90.801(2)(b), Florida Statutes (1981), provides such an exception and reads, in part:
(2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
... .
(b) Consistent with his testimony and is offered to rebut an express or implied charge against him of improper influence, motive, or recent fabrication. .. .
Appellant argues that this exception is not applicable on the basis of McElveen v. State, 415 So.2d 746 (Fla. 1st DCA 1982), in which the district court held that a prior consistent statement was inadmissible because it was not made prior to the existence of a fact said to indicate bias, interest, corruption, or other motive to falsify. See also Kellam v. Thomas, 287 So.2d 733 (Fla. 4th DCA 1974). In applying this principle to the facts of the instant case, appellant argues that it was error to allow the state to strengthen Williams' testimony by introducing evidence of her prior consistent statements made to her mother and sister, when the record clearly establishes a motive to falsify which existed at the time the consistent statement was made. The state argues that Williams' motive to falsify her testimony in order to save Bush from the death penalty was not present at the time she recited Parker's admission to her mother and sister. It asserts that the motive at that time was, at most, to make Bush look better in the eyes of her family. We disagree and find that a reasonable interpretation of the circumstances indicates that the same motive to falsify, namely, to keep Bush out of the electric chair, existed when both statements were made. We find that the admission of the challenged testimony was error because the testimony did not fall within the exception of section 90.801(2)(b). See McCormick, Handbook of the Law of Evidence (2d ed. 1972). We find, however, that the testimony of the mother and sister did not give significant additional weight to Williams' testimony and its admission was, therefore, harmless error. See Teffeteller v. State, 439 So.2d 840 (Fla. 1983), cert. denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984).
We next address the contention that the trial court erred in denying appellant's motion to suppress his taped statement and admissions. Appellant contends that his request to see if his mother had gotten a *138 lawyer to represent him was sufficient to invoke his right to remain silent. Prior to the interrogation which yielded appellant's admissions, appellant stated, "I want my mom to get me a lawyer." Appellant claims that the failure of the police to stop questioning him and allow appellant to speak with his mother after this request violates the requirements of Miranda and mandates the suppression of his subsequent statement. Upon an examination of the record in this case, we find that this argument is without merit. The totality of the circumstances establishes that Parker made a knowing, intelligent, and voluntary waiver of his right to remain silent. Prior to the statement, appellant repeatedly voiced his desire to make a statement after being advised by a representative of the public defender's office not to say anything. In addition, appellant was repeatedly advised of his right not to make any statement. We hold that the state proved by a preponderance of the evidence that the statement was freely and voluntarily made. The trial judge, therefore, properly denied the motion to suppress. See DeConingh v. State, 433 So.2d 501 (Fla. 1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); Sturdivan v. State, 419 So.2d 300 (Fla. 1982); Ross v. State, 386 So.2d 1191 (Fla. 1980).
Following our recent decision in State v. Neil, 457 So.2d 481 (Fla. 1984), Parker submitted a supplemental brief contending the trial court erred by overruling defense counsel's objection that the state had systematically excluded blacks from his jury. We disagree. During the course of the jury selection process, Parker's trial counsel timely objected on three separate occasions to the exclusion of prospective black jurors. After the initial objection, the trial judge announced there did not appear to be a systematic exclusion at that stage of the process. When defense counsel again objected to a black juror's exclusion, the court noted that the prospective juror had hesitated in answering questions concerning the imposition of the death penalty. When Parker's counsel objected to the exclusion of another black juror, the state voluntarily offered three reasons for the exclusion: the juror had stated that service might be a hardship on an invalid she was caring for; the prosecution had determined from the juror's voir dire responses that she apparently did not like capital punishment; and she appeared undecided in some of her answers. The judge noted that the juror had asked to be excused and that he had denied that request. The record reflects that at this stage of the proceeding the prosecutor had excused nine prospective jurors  five white and four black  through the use of peremptory challenges. In State v. Neil we established the following test:
The initial presumption is that peremptories will be exercised in a nondiscriminatory manner. A party concerned about the other side's use of peremptory challenges must make a timely objection and demonstrate on the record that the challenged persons are members of a distinct racial group and that there is a strong likelihood that they have been challenged solely because of their race. If a party accomplishes this, then the trial court must decide if there is a substantial likelihood that the peremptory challenges are being exercised solely on the basis of race. If the court finds no such likelihood, no inquiry may be made of the person exercising the questioned peremptories. On the other hand, if the court decides that such a likelihood has been shown to exist, the burden shifts to the complained-about party to show that the questioned challenges were not exercised solely because of the prospective jurors' race.
Id. at 486-87 (emphasis supplied; footnotes omitted). Although Parker has shown that the challenged prospective jurors belonged to a "distinct racial group," it is clear from this record that he failed to demonstrate "a strong likelihood" that these prospective jurors were challenged solely on the basis of their race. This record does not reveal the requisite likelihood of discrimination to require an inquiry by the trial court and a shifting of the burden to the state. In fact, *139 we find this record reflects nothing more than a normal jury selection process. For these reasons, we find no error in the jury selection process in this cause.
We reject without discussion Parker's remaining contentions that the trial court erred (a) in denying a requested jury instruction on independent acts of others; (b) in limiting the cross-examination of the witness Williams; and (c) in denying a motion for mistrial on the grounds that the prosecutor made improper statements in his closing argument. We find each of these issues to be without merit. We have reviewed the entire record in this case and find that there is substantial competent evidence to support appellant's convictions. We find no reversible error in the guilt phase of appellant's trial.

Penalty Phase
In the penalty phase, appellant first argues that the trial court erred in allowing the state to present evidence of appellant's prior criminal history during the cross-examination of a mental health professional who was qualified as an expert by the appellant. At the beginning of the penalty portion of the trial, appellant presented a written waiver of the intent to rely on the mitigating circumstance of no significant prior criminal activity, as codified in section 921.141(6)(a), Florida Statutes (1981). The appellant presented the testimony of a clinical psychologist who testified that appellant was a passive, non-aggressive individual. During cross-examination, the state made inquiry concerning the case history the psychologist had used in formulating his opinion and specifically asked him about criminal offenses related to him by the appellant. In response, the psychologist answered that appellant advised him that he had broken into a school at the age of nine. The state proceeded to inquire as to whether the expert knew about other offenses. Appellant claims that the admission of this testimony constitutes reversible error under this Court's decision in Maggard v. State, 399 So.2d 973 (Fla.), cert. denied, 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 598 (1981). We disagree and find appellant's reliance on Maggard to be misplaced. In Maggard, we held that the state's presentation of evidence of the defendant's prior criminal record of non-violent crimes to rebut the mitigating factor of no significant prior criminal history, upon which appellant had explicitly waived reliance, constituted reversible error. Id. at 977-78. In the instant case, the testimony of the defense expert that he based his opinion regarding appellant's non-violent nature on the appellant's past personal and social developmental history, including a prior criminal history, opened the door for this cross-examination by the state. We find that it is proper for a party to fully inquire into the history utilized by the expert to determine whether the expert's opinion has a proper basis. See Pensacola Electric Co. v. Bissett, 59 Fla. 360, 52 So. 367 (1910); Eggart v. State, 40 Fla. 527, 25 So. 144 (1898); Thurston v. State, 355 So.2d 1224 (Fla. 1st DCA 1978). We conclude that the trial court properly allowed the cross-examination of the psychologist on the contents of the case history.
Appellant next attacks the trial court's determination that three aggravating circumstances applied to this cause. Appellant, citing our decision in Kampff v. State, 371 So.2d 1007 (Fla. 1979), first asserts that this murder was not heinous, atrocious, and cruel because a pistol shot to the head of the victim does not establish this aggravating circumstance. We do not agree that Kampff applies to the circumstances in this case. We have previously stated that "fear and emotional strain preceding a victim's death may be considered as contributing to the heinous nature of the capital felony." Adams v. State, 412 So.2d 850, 857 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982). In the instant case, the victim was told by the defendants that they were going to kill her so she could not identify them and, in a 13-mile death-ride, she continued to plead for them not to hurt her. The record reflects that the victim knew her execution was imminent and a medical examiner testified that when he examined the victim's *140 bladder it was "completely and absolutely voided," a fact which is "consistent with her being in great fear prior to her death." Further, the victim was forcibly removed from the car with such force that large chunks of her hair were torn out by the roots. She was stabbed in the stomach by a codefendant and then shot, execution-style, after she had fallen to the ground in a kneeling position. These facts clearly establish that the murder was committed in a heinous, atrocious, and cruel manner.
We also reject appellant's contention that this offense was not committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The facts speak for themselves and evince the heightened premeditation necessary to establish this aggravating circumstance.
In his final point, appellant asserts that the trial court improperly found, as aggravating circumstances, that the murder was committed (1) in the course of a robbery and kidnapping and (2) for pecuniary gain. It is argued that this constitutes a doubling up of aggravating circumstances because robbery necessarily includes the factor of pecuniary gain and that this doubling up is contrary to our decisions in Vaught v. State, 410 So.2d 147 (Fla. 1982), and Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). We disagree. The kidnapping aspect of this crime is totally separate from that of pecuniary gain and, consequently, the use of both aggravating circumstances was proper.
From our review of the entire record, the imposition of the death penalty in this case is proportionately correct. For the reasons expressed, we affirm the appellant's convictions and sentence of death.
It is so ordered.
BOYD, C.J., and ADKINS, ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.