PER CURIAM.
David Beasher Snelgrove appeals his sentences of death for the 2000 murders of 84-year-old Glyn Fowler and his 79-year-old wife, Vivian Fowler.[1] We previously affirmed his convictions but reversed his original death sentences and remanded for a new penalty phase. Snelgrove v. State, 921 So.2d 560 (Fla.2005). For the reasons stated below, we now affirm his sentences.
I. FACTS AND PROCEDURAL HISTORY
The facts of this case were fully set out in this Court’s opinion on the initial direct appeal:
On Sunday, June 25, 2000, Glyn and Vivian Fowler were found dead in their home. The elderly couple had been brutally beaten and stabbed to death, as evidenced by multiple fractures and stab wounds spread throughout their bodies. Ultimately, Vivian died from a stab wound to the heart, and Glyn died of a brain injury caused by blunt force trauma to the head.
Evidence at the crime scene and in the surrounding area linked David Snel-grove, the twenty-seven-year-old nephew of one of the Fowlers’ neighbors, to the murder. Snelgrove had recently moved in with his aunt and his cousin, Jeff McCrae, after being expelled from a drug rehabilitation program. Blood droplets matching Snelgrove’s DNA were found throughout the house, as were bloody fingerprints and footprints matching Snelgrove’s. A trained bloodhound followed a scent from the blood on the Fowlers’ broken window to Snel-grove, and the police recovered a knife in the woods next to the Snelgrove home with blood matching Snelgrove’s DNA.
Snelgrove denied any involvement with the murder. On the day the Fowl-ers’ bodies were discovered, the Flagler County Sheriffs Office questioned Snel-grove about his activities that weekend and the cause of the cut on his hand. Snelgrove claimed he and Jeff McCrae had spent Friday evening at Don Silva’s home. Around 12:30 a.m., he and McCrae left Silva’s together, and Snel-grove claimed he spent the rest of the night at home. He attributed the cut on his hand to an accident that occurred on Monday, June 19, the last day of his landscaping job.
At trial, Jeff McCrae presented a different version of events. He testified that he and Snelgrove arrived at Silva’s separately on Friday, June 23, and they left together at approximately 12:30 a.m. On the way back to their house, they stopped to purchase crack cocaine. He did not notice any cuts or bandages on Snelgrove’s hand at that time. During the middle of the night, McCrae awoke to the sound of someone entering his house. He arose to find Snelgrove in the bathroom cleaning a cut on his hand and wiping what appeared to be blood from his leg and foot. Snelgrove stated that he had been in a fight, but he refused McCrae’s offer to take him to the hospital. Instead, he wrapped his hand in what was possibly a shirt,[3] and told McCrae that he wanted to get more cocaine. The two went to purchase cocaine from a man named “Kimo” (Cornelius Murphy). McCrae testified that the money used to buy the cocaine had blood on it. Later that night, police stopped “Kimo” at a Jiffy Food Store after he attempted to make a purchase with blood-stained money. DNA tests on one of the bills showed that the blood matched Snelgrove’s DNA.
*247 [[Image here]]
Additional testimony came from Gary Matthews, an inmate at the Flagler County Jail, where Snelgrove was detained when he was arrested on June 25. Mathews alleged that Snelgrove made critical admissions to him....
At trial, Matthews testified to his jailhouse conversations with Snelgrove. Specifically, Matthews testified that Snelgrove told him of a cooperative effort between him and McCrae to break into the Fowlers’ home and rob them of cash that the elderly couple kept in their bedroom. According to Matthews, Snel-grove claimed he knew of this money because he had borrowed money from the Fowlers in the past, and he was in need of money because another neighbor had refused his request for a loan. Snelgrove allegedly told Matthews that with McCrae acting as his lookout, Snel-grove broke a window with his hand and entered the house. He found his way to the master bedroom, but Glyn Fowler startled him before he could find the dresser where the money was kept. Glyn began to fight, and Snelgrove reported to Matthews that he beat and stabbed Glyn to death. In the commotion, Vivian awoke, and he beat and stabbed her as well. Matthews further testified that Snelgrove expressed remorse at his failure to look to the left when he entered the bedroom. If he had done this, he would have seen Vivian’s purse, and he could have taken it without having to kill the victims.
Snelgrove, 921 So.2d at 562-65 (various footnotes omitted).
On direct appeal, we. affirmed Snel-grove’s convictions but reversed the death sentences based on the jury’s failure to make individualized recommendations for each murder. Id. at 572-78.
On the first day of jury selection for Snelgrove’s new penalty phase, Snelgrove moved for a continuance, requesting “[additional time” to test for mental retardation. According to defense counsel, on the night before jury selection, Dr. Robert M. Berland, a forensic psychologist who examined Snelgrove and testified at the first penalty phase, notified defense counsel of his recommendation to again test Snel-grove to determine whether Snelgrove was mentally retarded.[2] As Dr. Berland later explained, his recommendation was based on his understanding of the “Flynn Effect,” which describes the tendency of revisions to the Weshler Adult Intelligence Scale (WAIS) test to produce lower scores for the same person than previous versions. Dr. Berland testified that, because Snelgrove’s previous score on the WAIS-R test was “borderline,” the WAIS-III test might produce a score in the retarded range. The trial court denied the motion to continue but allowed Snelgrove to proceed with the desired testing.
Following the second day of jury selection, Dr. Stephen Bloomfield, another forensic psychologist, conducted the requested WAIS-III test. Snelgrove indicated that his IQ score on the WAIS-III test was 70, a score consistent with “mild men *248 tal retardation.” Therefore, on the third day of jury selection, defense counsel renewed the motion for continuance, arguing that the WAIS-III results merited additional testing and that the trial court should conduct a hearing to determine mental retardation pursuant to Florida Rule of Criminal Procedure 3.203. The trial court denied the renewed motion after noting its belief that a delay was unnecessary because a determination on retardation could be made any time prior to sentencing.
At the new penalty phase, the prosecution presented extensive evidence detailing the scene of the crime, injuries to the victims, and incriminating injuries to Snel-grove. The prosecution’s evidence included expert testimony from forensic pathologist Dr. Thomas Beaver, who testified that both victims bore defensive wounds and had been severely beaten, strangled, and stabbed in the context of a prolonged struggle involving significant pain and suffering. Dr. Beaver further testified that, unlike Mrs. Fowler, who lived through all inflicted injuries, Mr. Fowler was alive only through the beating and strangling and died just prior to the stabbings. There was no sign of sexual assault.
Snelgrove presented testimony from corrections officers, family members, and experts. Dr. Drew Edwards, an expert in cocaine addiction, testified that cocaine impairs one’s judgment, decision-making, and behavioral control. Dr. Edwards also provided his opinion that Snelgrove was addicted to cocaine at the time of the murders, and he further expressed his opinion on cross-examination that Snelgrove would not have committed the crime if he was not intoxicated. Dr. Joseph Wu, an expert in PET scanning, testified that Snelgrove’s temporal lobe and subcortical areas were asymmetrical, abnormalities “consistent with a history of possible trauma” and producing a “disproportionate response to an insult or provocation or threat.” Dr. Wu also testified that cocaine can exacerbate abnormal functioning of the brain. Dr. Berland testified that Snelgrove exhibited signs of a psychotic disturbance, specifically, depression and delusional paranoid thinking. Based on that result, Dr. Berland testified that Snelgrove was acting under an extreme mental or emotional disturbance and was substantially impaired in his capacity to conform his conduct to the requirements of the law (but not in his capacity to appreciate the criminality of his conduct).[3] Snelgrove presented his educational records to Dr. Berland, who was questioned regarding Snelgrove’s placement in special education classes (ESE) as a child. And Dr. Bloomfield testified that he administered the WAIS-III test and that Snelgrove scored a 70, suggestive of mild mental retardation. However, Dr. Bloomfield testified that further testing was necessary for a diagnosis of retardation.
In rebuttal, the prosecution presented testimony from Dr. Lawrence Holder, a radiologist and nuclear medicine physician, who reviewed PET scan video and images prepared and analyzed by Dr. Wu. Dr. Holder testified that he observed no abnormality in the PET scan and instead found that Snelgrove’s brain operated normally. The prosecution also played video of Snelgrove’s statement to law enforcement and presented testimony from the officer who interrogated Snelgrove. The interrogating officer testified that Snel-grove appeared sober and aware throughout their contact. *249 The jury recommended, by separate votes of 8-4 and 8-4, death sentences for each murder.
Following the penalty phase, Snelgrove moved for a continuance to conduct further testing on mental retardation prior to a Spencer[4] hearing. In requesting the continuance, Snelgrove represented that an additional six months was necessary to properly investigate. The record indicates that the motion was granted and that the trial court accommodated Snelgrove by continuing the Spencer hearing from March 27, 2008, to June 3, 2009. In the meantime, Snelgrove concluded his testing and filed a motion to prohibit the death sentence.
At the Spencer hearing, Snelgrove presented evidence regarding possible mental retardation. His family members reiterated testimony given at the penalty phase that Snelgrove was twice hospitalized as a child, once when he fell out of a shopping cart and once when he overdosed on a relative’s prescription medication. Family members offered their observations that Snelgrove was a hyperactive child and mentally “slow,” and an older cousin recalled that Snelgrove grew depressed after his parents died. Snelgrove also presented testimony from Dr. Bloomfield, who added to his penalty-phase testimony by detailing his findings that Snelgrove had a significant deficit in adaptive functioning and that the adaptive deficit “likely’ manifested prior to age 18. Dr. Bloomfield testified that he inferred both findings from the fact that, when Snelgrove was a child, he was classified by the public school system as “emotionally handicapped” (EMO) and, as a result of the classification, placed in exceptional student education (ESE) classes. Dr. Bloomfield could not locate any records to explain Snelgrove’s ESE/EMO designation. However, he testified that such a designation — made before Snelgrove was 18 — would have resulted from “some combination” of observable “maladaptive behavior” which serves to define an emotional handicap and could be roughly transferred to a determination that Snelgrove had deficient adaptive functioning. Dr. Bloomfield clarified that he could not provide a definitive answer as to intellectual functioning prior to age 18 because he could not find an IQ score on Snelgrove prior to age 18.
In response to Dr. Bloomfield’s testimony, the prosecution presented expert testimony from Dr. Gregory Prichard, a forensic psychologist who evaluated Snelgrove for mental retardation and reviewed the same documentation used by Dr. Bloomfield. Dr. Prichard administered the Stanford-Binet 5 test and determined that Snelgrove’s full-scale IQ was 75, above the retarded range. Prichard further testified that, while Snelgrove’s ESE/EMO designation likely indicated behavioral problems beginning prior to age 18, it also meant that the school system had likely ruled out the possibility of intellectual problems first by testing Snelgrove’s IQ and declining to classify him as mentally retarded. Placing a mentally retarded child in EMO classes, he said, would be illegal. Dr. Prichard did not see any evidence of intellectual limitations in his four-hour interview with Snel-grove or in Snelgrove’s records.
After the Spencer hearing but before the sentencing hearing, the trial court issued an order denying Snelgrove’s mental retardation claim and specifically noting that the claim would have failed even under the preponderance of the evidence standard. In its order, the trial court noted the conflict among Drs. Bloomfield (IQ of 70) and Prichard (IQ of 75) regarding Snelgrove’s intellectual functioning. It *250 further found that Snelgrove was not deficient in adaptive functioning, citing evidence that Snelgrove had no trouble communicating, maintaining relationships, keeping full-time employment, and caring for himself. Finally, the trial court determined that the record conclusively refuted manifestation of the condition prior to the age of 18 because Snelgrove’s placement in ESE/EMO classes did not constitute evidence of mental retardation.
Ultimately, the trial court followed the jury’s recommendation and imposed two death sentences for the murders. The trial court found five aggravators applicable to each of the two murders: (1) the murder was committed when Snelgrove was on community control for a felony offense of tampering with physical evidence (little to some weight); (2) prior violent felony based on the contemporaneous murder (great weight); (3) the murder was committed during the commission of robbery and/or burglary, merged with pecuniary gain (significant weight); (4) the murder was especially heinous, atrocious, or cruel (HAC) (great weight); and (5) the victim was particularly vulnerable due to advanced age (significant weight). The trial court found one statutory mitigator— extreme mental or emotional disturbance (significant weight) — and the following nonstatutory mitigators: (1) Snelgrove was a hard worker (some weight); (2) Snel-grove was a loving and caring person who was loved by his family (some weight); (3) Snelgrove had a long history of drug addiction (significant weight); (4) Snelgrove was greatly impacted by the death of his parents (some weight); (5) Snelgrove is a model inmate and has adjusted well to a structured environment (little weight); (6) Snelgrove suffers from some abnormal brain functioning and has a somewhat limited level of intelligence (some weight).
II. ISSUES RAISED ON APPEAL
Snelgrove raises seven issues on appeal: (A) whether the trial court erred in denying Snelgrove’s motion for continuance before the penalty phase to further explore the possibility that Snelgrove was retarded; (B) whether the trial court erred in finding that Snelgrove was not mentally retarded; (C) whether the trial court erred in admitting video of Snel-grove’s statement to law enforcement; (D) whether the trial court erred in instructing the jury on its advisory role; (E) whether the trial court erred in allowing the prosecution to cross-examine mental health experts Dr. Berland and Dr. Edwards regarding their knowledge of the facts surrounding the murders; (F) whether the prosecution’s comments and the trial court’s instructions regarding victim impact evidence together constituted reversible error; and (G) whether the trial court erred in considering and weighing several aggravators and miti-gators.
A. Snelgrove’s Motion for Continuance
Snelgrove argues that the trial court erred in denying his pre-penalty phase motion for continuance in which Snelgrove sought additional time to test for mental retardation and to present the evidence at the penalty phase. We disagree.
We have repeatedly explained that
[ a] court’s ruling on a motion for continuance will only be reversed when an abuse of discretion is shown. An abuse of discretion is generally not found unless the court’s ruling on the continuance results in undue prejudice to the defendant. This general rule is true even in death penalty cases. While death penalty cases command our closest scrutiny, it is still the obligation of an appellate court to review with caution *251 the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance.
Doorbal v. State, 983 So.2d 464, 486 (Fla.2008) (quoting Hernandez-Alberto v. State, 889 So.2d 721, 730 (Fla.2004) (citations omitted)).
Under that rubric, we have held that the trial court does not abuse its discretion where the requesting party has unjustifiably caused the delay or requests an indefinite suspension of the proceedings. See Doorbal, 983 So.2d at 489; Wyatt v. State, 641 So.2d 1336, 1340 (Fla.1994). In Door-bal, this Court affirmed denial of a motion for continuance where postconviction counsel sought to postpone an evidentiary hearing to investigate mental health evidence. Id. This Court in Doorbal observed that postconviction counsel was responsible for several delays in the case and held that, under those facts, the postconviction court did not abuse its discretion in denying a continuance. Id. at 488-89. Likewise, in Wyatt, this Court determined that there was no abuse of discretion in denying a continuance where the delay was attributable to the defendant and the length of the requested continuance was unknown. 641 So.2d at 1340 & n. 5.
Here, the trial court did not err in denying Snelgrove’s motion for continuance because Snelgrove requested an indefinite continuance at a late stage in the proceedings to investigate information within his control. In his initial motion for continuance, Snelgrove sought additional time to collect evidence on mental retardation for presentation to the jury. At that time, Snelgrove requested time to collect evidence on all three statutory prongs necessary to show mental retardation: (1) significantly subaverage general intellectual functioning;[5] (2) concurrent deficits in adaptive behavior; and (3) manifestation of both during the period from conception to age 18. See § 921.137(1), Fla. Stat. (2008).
As in Doorbal and Wyatt, the information sought had been available to the defendant, and the length of the requested continuance was unknown. Snelgrove made this motion on the first day of jury selection on his second penalty phase. Snelgrove was permitted to undergo IQ testing at this stage to satisfy the first prong. After Snelgrove received the results, he renewed his motion on the third day of jury selection and requested an indefinite period of additional time to conduct mental retardation investigation on the second and third prongs. The trial court denied the motion on the basis that mental retardation as a bar to execution could be proven at any time prior to sentencing.
In any event, Snelgrove was not unduly prejudiced by the trial court’s decision against giving him additional time to investigate mental retardation prior to the conclusion of the penalty phase. See Israel v. State, 837 So.2d 381, 388 (Fla.2002) (“Because the trial court’s informed ruling did not result in undue prejudice to Israel, we find the trial court did not abuse its discretion....”). At the penalty phase, Snelgrove presented as mitigating evidence his WAIS-III results, records of childhood placement in ESE classes, and testimony from family that he was “never all there” and had “always been slow.”[6] Snelgrove presented the same evidence *252 and the same experts to support his mental retardation claim at the Spencer hearing, which took place after a delay of over a year. Although Snelgrove’s experts provided additional discussion at the Spencer hearing regarding adaptive deficits and the age of onset, the experts’ opinions were mere inferences derived from the educational records already discussed by the experts at the penalty phase. Snelgrove was wholly unable to present evidence of subaverage general intellectual functioning as a child, even after the year-long delay. Because his IQ score of 70 and his academic problems were presented as mitigation without the continuance and because Snelgrove was unable to present any further evidence of retardation after a post-penalty-phase continuance, Snelgrove was not unduly prejudiced by the denial of his motion for continuance prior to the penalty phase.
Accordingly, the trial court did not abuse its discretion in denying Snelgrove’s motion for continuance.
B. Trial Court’s Finding that Snelgrove Was Not Mentally Retarded
Snelgrove argues that the trial court erred by finding that Snelgrove was not mentally retarded.[7] However, we affirm.
Florida law includes a three-prong test for mental retardation as a bar to imposition of the death penalty. See § 921.137(1), Fla. Stat. (2009); Fla. R.Crim. P. 3.203; Nixon v. State, 2 So.3d 137, 141 (Fla.2009); Cherry v. State, 959 So.2d 702, 711 (Fla.2007). This Court has “consistently interpreted section 921.137(1) as providing that a defendant may establish mental retardation by demonstrating all three of the following factors: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen.” Nixon, 2 So.3d at 142. At trial, the defendant “carries the burden to prove mental retardation by clear and convincing evidence.” Franqui v. State, 59 So.3d 82, 92 (Fla.2011); see § 921.137(4),- Fla. Stat. (2009). “We review the circuit court’s determination that a defendant is not mentally retarded for competent, substantial evidence, and we do not reweigh the evidence or second guess the circuit court’s findings as to the credibility of the witnesses.” Franqui, 59 So.3d at 91 (internal quotations marks omitted). But “to the extent that the circuit court decision concerns any questions of law, we apply a de novo standard of review.” Dufour v. State, 69 So.3d 235, 246 (Fla.2011).
Here, there was competent, substantial evidence to support the trial court’s finding that Snelgrove is not mentally retarded. See Franqui, 59 So.3d at 91. First, competent, substantial evidence supports the conclusion that Snelgrove failed to establish subaverage general intellectual functioning. We have found support for a *253 finding against subaverage general intellectual functioning where the IQ scores did not definitively suggest mental retardation. See Phillips v. State, 984 So.2d 503, 511 (Fla.2008) (“[T]he majority of Phillips’s IQ scores exceed that required under section 921.137. Moreover, the court questioned the validity of the only IQ score falling within the statutory range for mental retardation.”); Jones v. State, 966 So.2d 319, 329 (Fla.2007) (“Jones’s scores on the WAIS were as follows: 72 (1991), 70 (1993), 67 (1999), 72 (2003), and 75 (2005). In other words, the scores did not indicate ‘significantly subaverage general intellectual functioning.’ ”). Snelgrove scored a 78 on the WAIS-R, a 70 on the WAIS-III, and a 75 on the Stanford-Binet 5. The trial court found the last score of 75 to be more credible than the score of 70, given Snelgrove’s childhood placement in “emotionally handicapped” classes instead of “edueable mentally handicapped” or “trainable mentally handicapped” classes. See Burns v. State, 944 So.2d 234, 247 (Fla.2006) (finding competent, substantial evidence in spite of one IQ score of 69 because the more credible expert scored Burns’ IQ at 74).
Second, competent, substantial evidence supports the conclusion that Snelgrove failed to demonstrate deficits in adaptive behavior. See Dufour, 69 So.3d at 248. Section 921.137(1), Florida Statutes, defines “adaptive behavior” as “the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.” Along these lines, the prosecution’s expert testified that Snelgrove was able to use abstractions in communication and had no trouble communicating or comprehending questions. Snelgrove’s family testified that he maintained significant family relationships, especially with his mother, and had no trouble maintaining employment in businesses inside and outside of family ownership. Snelgrove had a driver’s license, drove company vehicles, and babysat for the family. Additionally, while in prison, Snelgrove lodged several complaints, sought services for basic needs, and requested items that included a dictionary, pinochle cards, and prior medical reports. In short, there was evidence to support the finding that Snelgrove met “the standards of personal independence and social responsibility.” § 921.137(1), Fla. Stat.
Finally, there was competent, substantial evidence to support the trial court’s finding regarding the age of manifestation. Though the school records indicated academic problems beginning prior to age 18, Snelgrove offered no evidence to explain them or his placement in ESE/EMO classes. In the absence of records, Snel-grove and the prosecution offered conflicting expert testimony regarding why a child may receive such a designation.[8] Yet Snelgrove’s expert limited his discussion to the manifestation of deficient adaptive behavior and admitted that he could not provide a definitive answer as to intellectual functioning prior to age 18. Based on the lack of information to support the claim, Snelgrove could not satisfy the third prong of the mental retardation statute. See Phillips, 984 So.2d at 512 (“As the trial court found, ‘there was no evidence [t]o support the Defendant’s contention that his poor , grades were a result of mental retardation.’ ”); Cherry, 959 So.2d at 711 *254 (clarifying the statutory requirement by explaining that the defendant must establish that both “subaverage general intellectual functioning and deficits in adaptive behavior manifested before the age of eighteen”).
Accordingly, we affirm the trial court’s mental retardation determinations.
C. Snelgrove’s Statement to Law Enforcement
Snelgrove argues that the trial court erred in allowing the prosecution to present a videotape of Snelgrove’s interrogation in rebuttal to Snelgrove’s mental health evidence.[9] For the reasons that follow, we disagree.
Section 921.141(1), Florida Statutes (2008), “provides ‘wide latitude ... in admitting penalty-phase evidence.’ ” Marek v. State, 14 So.3d 985, 996 (Fla.2009) (quoting Rutherford v. State, 727 So.2d 216, 221 (Fla.1998)). Specifically, it provides that, during the penalty phase of a capital trial,
evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.
§ 921.141(1), Fla. Stat. A trial court’s admission or exclusion of evidence under section 921.141 is reviewed for abuse of discretion. Miller v. State, 42 So.3d 204, 225 (Fla.2010), cert. denied, - U.S. -, 131 S.Ct. 935, 178 L.Ed.2d 776 (2011).
Here, the videotape of Snelgrove offering an alternative account of his whereabouts and the cause of his injury provided evidence to rebut expert testimony in support of the impaired capacity mitigator because it demonstrated that Snelgrove knew right from wrong and was capable of taking logical steps to deceive law enforcement. See Abdool v. State, 53 So.3d 208, 220-21 (Fla.2010) (holding that the trial court did not err in allowing the prosecution to present expert testimony regarding the defendant’s ability to tell right from wrong to rebut mental health mitigation argument); see also Zommer v. State, 31 So.3d 733, 750 (Fla.2010) (“This Court has previously upheld rejection of this statutory mitigating factor where a defendant ‘took logical steps to conceal his actions from others.’”) (quoting Nelson v. State, 850 So.2d 514, 531 (Fla.2003) (quoting trial court’s order)). Notably, the video did not contain statements from Snelgrove or law enforcement indicating that he lacked remorse, and the prosecution did not argue that the video depicted alleged lack of remorse. Cf. Sireci v. State, 587 So.2d 450, 454 (Fla.1991) (holding that the trial court erred in allowing the prosecution to present testimony that “after Sired read about the murder in the newspaper, ‘he seemed rather proud of it.’ ”).
*255 Likewise, the trial court did not abuse its discretion in allowing the prosecution to play a portion of the video in which Snelgrove answered questions for the purpose of conducting a computer voice stress analysis (CVSA) test. His answers to basic questions, including what type of shoes he was wearing, his name, and in which state he was located, were relevant to show awareness and a general ability to communicate. Moreover, the prosecution did not reveal the results of the CVSA test. See Sullivan v. State, 303 So.2d 632, 635 (Fla.1974) (declining to reverse even though the witness referred to a polygraph test and noting “that the witness never referred to the actual results of the polygraph test in any manner”).
Accordingly, the trial court did not abuse its discretion in allowing the prosecution to present the videotape of Snel-grove’s statement to law enforcement.
D. Instructions Concerning Jury’s Advisory Role
Snelgrove argues that the trial court’s instruction improperly advised the jury on its role in issuing an advisory sentence and that the prosecution improperly urged jurors to follow the allegedly erroneous instruction. He argues that the trial court should have given his requested instruction that the jury was “never required to recommend a sentence of death.” We disagree.
“[F]ailure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards.” Coday v. State, 946 So.2d 988, 994 (Fla.2006) (quoting Stephens v. State, 787 So.2d 747, 755 (Fla.2001)). A trial court’s denial of special jury instructions is reviewed for abuse of discretion. See Hudson v. State, 992 So.2d 96, 112 (Fla.2008).
Here, the trial court declined to give Snelgrove’s requested instruction and instead instructed the jury as follows:
The sentence that you recommend to this Court must be based on the facts you find from the evidence and the law. You should weigh the aggravating circumstances against the mitigating circumstances, and your advisory sentence ... must be based on these considerations.
The trial court did not err because it provided instructions substantially tracking this Court’s approved instruction at that time and adequately addressed the role of the penalty-phase jury. See Phillips v. State, 39 So.3d 296, 304 (Fla.2010), cert. denied, - U.S. -, 131 S.Ct. 520, 178 L.Ed.2d 384 (2010). Even after this standard instruction was amended, this Court has maintained that the instructions in the former version “fully advise the jury of the importance of its role, correctly state the law, and do not denigrate the role of the jury.” Id. (quoting Reese v. State, 14 So.3d 913, 920 (Fla.2009)). And, because the instruction given was not erroneous, it follows that the prosecution’s argument that the jury “follow the law” as instructed could not have contributed to any error.
Accordingly, the trial court did not err in instructing the jury on its role.
E. Cross-examination of Dr. Berland and Dr. Edwards
Next, Snelgrove argues that the trial court erred in allowing the prosecution to cross-examine his mental health experts, Drs. Berland and Edwards, regarding their knowledge of the facts surrounding the murders. Specifically, he claims that the prosecution improperly questioned Dr. Berland as to whether he had reviewed a statement from an inmate to whom Snelgrove confessed and Dr. Edwards as to whether Snelgrove disclosed *256 his efforts to wash off blood and hide bloody clothes from law enforcement. We find no abuse of discretion in the trial court’s decision against limiting the scope of cross-examination in these instances.
“The facts and data relied upon in forming the expert’s opinion may be explored on cross-examination.” Charles W. Ehrhardt, Florida Evidence § 702.5 (2011 ed.); see also § 90.705(1), Fla. Stat. (2008) (“On cross-examination the expert shall be required to specify the [underlying] facts or data.”). The trial court also has the discretion to permit cross-examination into additional matters. § 90.612(2), Fla. Stat. (2008); see Boyd v. State, 910 So.2d 167, 185 (Fla.2005). Trial court decisions on the scope of cross-examination are reviewed for abuse of discretion. Boyd, 910 So.2d at 185.
With respect to the cross-examination of the defense’s penalty-phase expert, this Court has stated that “it is proper for a party to fully inquire into the history utilized by the expert to determine whether the expert’s opinion has a proper basis.” Parker v. State, 476 So.2d 134, 139 (Fla.1985). Moreover, because of the broader admissibility of evidence during the penalty phase, see § 921.141(1), Fla. Stat. (2008), an expert witness at the penalty phase of a trial may be subjected to cross-examination on matters not admissible in other contexts. See Coday, 946 So.2d at 1006-07; Valle v. State, 581 So.2d 40, 46 (Fla.1991).
Here, the trial court did not abuse its discretion in allowing the prosecution to question Snelgrove’s experts because the questions properly explored the bases of the experts’ opinions. See Parker, 476 So.2d at 139. First, cross-examination of Dr. Berland regarding his knowledge of a witness statement that revealed Snelgrove had first attempted to obtain money legally and had planned the robbery in advance was relevant to Dr. Berland’s testimony in support of the extreme mental or emotional disturbance mitigator. See Ault v. State, 53 So.3d 175, 189 (Fla.2010) (“Ault’s admission that he planned the abduction and assault of the victims in advance ... negates a finding that he was under an extreme mental or emotional disturbance at the time of the offense.”), cert. denied, - U.S. -, 132 S.Ct. 224, 181 L.Ed.2d 124 (2011); Hoskins v. State, 965 So.2d 1, 17 (Fla.2007) (“The defense’s own expert testified that Hoskins’s actions required planning. The facts of the murder are inconsistent with a claim that Hoskins was under the influence of an extreme mental or emotional disturbance.”). Similarly, cross-examination of Dr. Edwards regarding Snelgrove’s attempts to wash the blood was proper to explore Dr. Edward’s direct testimony that cocaine would have limited Snelgrove’s judgment, decision-making, and behavioral control. See Zommer, 31 So.3d at 750 (“[TJhese actions are indicative of someone who knows he has committed a serious crime and is taking steps to avoid detection. Therefore, although Zommer may have had some drugs in his system at the time of the murder, the evidence does not support a finding that those drugs substantially impaired his capacity....”).
Accordingly, the trial court did not abuse its discretion in declining to limit the scope of the prosecution’s cross-examination.
F. Jury Instructions and Prosecutorial Comment on Victim Impact Evidence
Snelgrove argues that the trial court abused its discretion in denying his proposed instruction regarding victim impact evidence. He also argues that the prosecutor delivered an improper argument regarding the victim impact evidence and that the argument, together with the in *257 struction, constituted reversible error. On both points, we disagree.
“[Fjailure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards.” Coday, 946 So.2d at 994 (quoting Stephens, 787 So.2d at 755). A trial court’s denial of special jury instructions is reviewed for abuse of discretion. See Hudson, 992 So.2d at 112.
Here, the trial court did not err because the instruction as given adequately addressed the applicable legal standards. See Coday, 946 So.2d at 994. The trial court told the jury that victim impact evidence “shall not be considered as establishing either an aggravating circumstance or rebuttal of a mitigating circumstance.” It added, however, that the jury “may still consider victim’s impact evidence in making your decision in this matter.” These are adequate statements of the law, the substance of which has been approved by this Court in other cases. See, e.g., Hernandez v. State, 4 So.3d 642, 666 (Fla.2009); Hoskins, 965 So.2d at 13-14; Alston v. State, 723 So.2d 148, 160 (Fla.1998).
Snelgrove also challenges as improper the comments made by the prosecutor in closing arguments that Mr. Fowler was a World War II veteran and that Mrs. Fowler was a “wife of a lifetime.” Because there was no contemporaneous objection to the comments, Snelgrove must demonstrate that there was fundamental error. See Hayward v. State, 24 So.3d 17, 42 (Fla.2009). Fundamental error is error that “ ‘reaches down into the validity of the trial itself and that a sentence of death ‘could not have been obtained without the assistance of the alleged error.’ ” Id. (quoting Simpson v. State, 3 So.3d 1135, 1146 (Fla.2009)).
In this case, the prosecutor’s comment does not rise to the level of fundamental error because the comment was brief and merely summarized victim impact information already in evidence. This Court has held that similar arguments were permissible statements showing the victim’s uniqueness as an individual. See, e.g., Orme v. State, 896 So.2d 725, 739-40 (Fla.2005) (finding permissible prosecutorial argument describing the victim as “a young nurse just finishing her studies, just completing her exam, trying to raise a son, trying to come help a friend who complained of being sick”); Cherry v. Moore, 829 So.2d 873, 880 (Fla.2002) (“The victims were in fact elderly and the State may argue the facts in the record”). Additionally, elsewhere in his closing argument, the prosecutor’s argument reminded the jury that victim impact evidence should not be considered as supportive of an aggravator.
Because the trial court did not abuse its discretion in instructing the jury on victim impact evidence and because the prosecutor made permissible comments at closing argument, we find no reversible error.
G. Consideration and Weight Given to Aggravators and Mitigators
Snelgrove makes numerous claims of trial court error in the sentencing order. For the reasons that follow, however, we reject these claims.
This Court has explained that
[ t]he weight to be given aggravating factors is within the discretion of the trial court, and it is subject to the abuse of discretion standard. Sexton v. State, 775 So.2d 923, 934 (Fla.2000). “[Discretion is abused only where no reasonable man would take the view adopted by the trial court.” Huff v. State, 569 So.2d 1247, 1249 (Fla.1990) (quoting Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980)). We affirm the weight accorded an aggravator if based on compe *258 tent, substantial evidence. Sexton, 775 So.2d at 934.
Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006). And with respect to a trial court’s findings on mitigators,
[ t]he Court in Campbell v. State, 571 So.2d 415 (Fla.1990), established relevant standards of review for mitigating circumstances: 1) Whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review by this Court; 2) whether a mitigating circumstance has been established by the evidence in a given case is a question of fact and subject to the competent substantial evidence standard; and finally 3) the weight assigned to a mitigating circumstance is within the trial court’s discretion and subject to the abuse of discretion standard.
Blanco v. State, 706 So.2d 7, 10 (Fla.1997) (footnotes omitted).

1. Weight given to community control aggravator

First, Snelgrove argues that the trial court should have assigned less weight to this aggravator because community control was imposed for a nonviolent offense that did not merit a prison sentence. In weighing the aggravator, the trial court explicitly considered the nature of the underlying offense and concluded, “Because this offense was non-violent in nature, the Court gives it little to some weight.” Accordingly, the trial court did not abuse its discretion in assigning “little to some weight” to the community control aggravator. See Buzia, 926 So.2d at 1216.

2. Weight given to prior violent felony aggravator

Next, Snelgrove argues that the trial court erred in assigning “great weight” to the prior violent felony aggra-vator because the prior violent felony was a contemporaneous murder and because Snelgrove had, up to the time of the murders, lived a “violence-free life.” The trial court did not abuse its discretion in assigning great weight to this aggravator. See Frances v. State, 970 So.2d 806, 816 (Fla.2007). We have repeatedly stated that “the prior violent felony aggravator is considered one of the weightiest aggravators,” Silvia v. State, 60 So.3d 959, 974 (Fla.2011), and have found no abuse of discretion when the trial court assigns great weight to the prior violent felony aggravator based on a contemporaneous murder, see, e.g., Winkles v. State, 894 So.2d 842, 846 (Fla.2005).

3.Improper doubling

Next, Snelgrove argues that the trial court erred by improperly doubling the HAC and victim vulnerability aggrava-tors. We disagree.
This Court has explained that
[ i]mproper doubling occurs when both aggravators rely on the same essential feature or aspect of the crime. Provence v. State, 337 So.2d 783, 786 (Fla.1976). However, there is no reason why the facts in a given case may not support multiple aggravating factors so long as they are separate and distinct aggra-vators and not merely restatements of each other, as in murder committed during a burglary or robbery and murder for pecuniary gain, or murder committed to avoid arrest and murder committed to hinder law enforcement. Echols v. State, 484 So.2d 568, 575 (Fla.1985); see, e.g., Davis v. State, 604 So.2d 794, 798 (Fla.1992) (improper doubling where murder was found to be both committed during the course of a burglary and for pecuniary gain where purpose of burglary was pecuniary gain).
Banks v. State, 700 So.2d 363, 367 (Fla.1997).
*259 Here, the trial court did not err because the aggravators of HAC and victim vulnerability focus on different aspects of the crime and are not “merely restatements of each other.” Id. In finding HAC, the trial court recounted the facts that Mr. Fowler likely observed the death of his wife, that Mrs. Fowler was either strangled or held by the neck while attacked, and that both victims were conscious while being attacked, received multiple blows to the head and face, and were stabbed multiple times. The victim vulnerability aggravator, meanwhile, relied on the disparity in age, health, and size between Snelgrove and his victims.
Accordingly, there was no improper doubling in this case.

4.Weight given to drug addiction

Snelgrove claims that the trial court erred in rejecting or giving little weight to the fact that, at the time of the murders, Snelgrove craved crack cocaine and was controlled by his addiction to the drug. However, contrary to Snelgrove’s assertion, the trial court gave “significant weight” to a nonstatutory mitigator entitled “Defendant had a long history of drug addiction.” In making this finding, the trial court indeed recognized that Snel-grove’s “drug addiction played a role in the crimes committed” and that Snelgrove had “unsuccessfully sought treatment” in the past. Significantly, Snelgrove’s addiction to and use of drugs prior to commission of the murder also formed the sole basis for the statutory mitigator of extreme mental or emotional disturbance, given “significant weight.” Accordingly, the trial court did not abuse its discretion.

5. Full consideration of evidence to support mental or emotional disturbance

Next, Snelgrove argues that, in its finding on the extreme mental or emotional disturbance mitigator, the trial court failed to consider the irresistible impact of Snel-grove’s addiction, the recent death of Snel-grove’s parents, and Snelgrove’s biological brain damage. Again, contrary to Snel-grove’s assertions, the trial court explicitly considered all of the evidence referenced by Snelgrove. Evidence of Snelgrove’s drug addiction supported the extreme mental or emotional disturbance mitigator (significant weight) and the “long history of drug addiction” mitigator (significant weight). His parents’ deaths supported a separate nonstatutory mitigator entitled “The death of David Snelgrove’s parents greatly impacted the Defendant” (some weight). And the evidence on Snelgrove’s biological brain damage supported a non-statutory mitigator noting “abnormal brain function” and “somewhat limited level of intelligence” (some weight). Accordingly, the trial court did not abuse its discretion.

6. Rejection of impaired capacity miti-gator

Finally, Snelgrove argues that the trial court erred in rejecting the statutory mitigator that Snelgrove’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.[10] However, we disagree and affirm the trial court’s *260 rejection of the impaired capacity miti-gator.
As explained in Durousseau v. State, 55 So.3d 543, 560-61 (Fla.2010),
[ t]his Court will not disturb a trial court’s rejection of a mitigating circumstance if the record contains competent, substantial evidence to support the trial court’s rejection of the mitigation. See Spencer v. State, 645 So.2d 377, 381, 385 (Fla.1994); Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). There must be a rational basis for the trial court’s rejection of such mitigation at a capital sentencing proceeding. Lebron v. State, 982 So.2d 649, 660 (Fla.2008)....
We have articulated a distinction between factual evidence and opinion testimony. ... “[C]ertain kinds of opinion testimony clearly are admissible — and especially qualified expert testimony— but they are not necessarily binding even if uncontroverted. Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking.” Walls [v. State, 641 So.2d 381, 390-91 (Fla.1994) ].
With regard to the impaired capacity mitigator, “[t]his Court has previously upheld rejection of this statutory mitigating factor where a defendant ‘took logical steps to conceal his actions from others.’ ” Zommer, 31 So.3d at 750 (quoting Nelson, 850 So.2d at 531 (quoting trial court’s order)). Evidence of “logical steps” conflicts with expert testimony on this mitigator because the steps constitute “purposeful actions ... indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired.” Hoskins, 965 So.2d at 18 (quoting Nelson, 850 So.2d at 531); see also Ault, 53 So.3d at 188; Provenzano v. State, 497 So.2d 1177, 1184 (Fla.1986) (“[S]everal actions taken by Provenzano on the day of the shootout support a finding that he knew his conduct was wrong and that he could conform his conduct to the law if he so desired.”).
Here, there is competent, substantial evidence to support rejection of the impaired capacity mitigator. There was evidence that, after committing the murders, Snel-grove washed off the blood, hid his clothes in the attic, and lied to law enforcement about committing the murders. Such evidence demonstrated that Snelgrove was capable of taking logical steps to conceal his actions from others. See Abdool, 53 So.3d at 220-21; Zommer, 31 So.3d at 750. Additionally, Dr. Berland’s testimony in support of the mitigator did not provide evidence of Snelgrove’s mental state at the time of the crime. Dr. Berland clarified that he had not spoken to Snelgrove about the crime and did not have the information necessary to form a causal link between Snelgrove’s psychosis and the crime.
Accordingly, we affirm the trial court’s rejection of the impaired capacity miti-gator.
III. PROPORTIONALITY
Although Snelgrove did not challenge the proportionality of the death sentence, “proportionality of the death sentence is an issue that this court must review in every death penalty case.” Orme v. State, 25 So.3d 536, 553 (Fla.2009). We conclude that Snelgrove’s sentence is proportionate.
This Court is required to review the proportionality of a death sentence “in order to prevent the imposition of unusual punishments under the Florida Constitution.” Phillips, 39 So.3d at 305. However, in analyzing proportionality, “[t]his Court’s function is not to reweigh the mitigating factors against the aggravating fac *261 tors; that is the function of the trial judge.” Id. (quoting Blake v. State, 972 So.2d 839, 846 (Fla.2007)). Instead, in deciding whether death is a proportionate penalty, this Court considers the “totality of the circumstances” and compares the case with other capital cases. Urbin v. State, 714 So.2d 411, 417 (Fla.1998) (quoting Sliney v. State, 699 So.2d 662, 672 (Fla.1997)). As it compares the case with others, this Court performs “a two-pronged inquiry ... to ‘determine [whether] the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.’” Ault, 53 So.3d at 196 (quoting Almeida v. State, 748 So.2d 922, 933 (Fla.1999)). The review is a “qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” Urbin, 714 So.2d at 416. In other words, “comparison is not simply a calculation of the number of aggravators and mitigators.” Lebron, 982 So.2d at 668.
In this case, the jury recommended, in separate 8-4 votes, the death sentence for each murder. The trial court found five aggravators applicable to each of the two murders: (1) commission while on community control (little to some weight); (2) prior violent felony (great weight); (3) commission during robbery and/or burglary, merged with pecuniary gain (significant weight); (4) HAC (great weight); and (5) the victim was particularly vulnerable (significant weight). “[T]he heinous, atrocious, or cruel aggravator is one of the ‘most serious aggravators set out in the statutory sentencing scheme.’” Aguirre-Jarquin v. State, 9 So.3d 593, 610 (Fla.2009) (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)). And “the prior violent felony aggravator is considered one of the weightiest aggravators.” Silvia, 60 So.3d at 974. The trial court found one statutory mitigator — extreme mental or emotional disturbance (significant weight) — and the following nonstatutory mitigators: (1) Snelgrove was a hard worker (some weight); (2) Snelgrove was a loving and earing person who was loved by his family (some weight); (3) Snelgrove had a long history of drug addiction (significant weight); (4) Snelgrove was greatly impacted by the death of his parents (some weight); (5) Snelgrove is a model inmate and has adjusted well to a structured environment (little weight); (6) Snelgrove suffers from some abnormal brain functioning and has a somewhat limited level of intelligence (some weight).
This case is comparable to numerous other cases involving similar aggravators and similar or weightier mitigators. See Aguirre-Jarquin, 9 So.3d at 600 (death sentence proportionate in double homicide with aggravators of prior violent felony, commission during burglary, and HAC (and for one murder, avoid arrest and victim was particularly vulnerable due to disability); statutory mitigators of extreme emotional disturbance, impaired capacity, and age; and nonstatutory mitigators including long-term substance abuse, childhood abuse, and brain damage from substance abuse); Frances, 970 So.2d at 820-21 (death sentence proportionate in double homicide with aggravators of commission during robbery and prior violent felony (and for one victim, HAC); statutory miti-gator of age; and nonstatutory mitigators including abandonment by mother and pathological relationship with brother); Francis v. State, 808 So.2d 110, 141 & n. 12 (Fla.2002) (death sentence proportionate in double homicide with aggravators of prior violent felony, commission during robbery, HAC, and victims were particularly vulnerable due to advanced age; statutory mitigators including defendant’s age and extreme mental or emotional disturbance; and nonstatutory mitigators including mental illness, impaired capacity, and *262 no significant history of prior violent criminal activity).
Accordingly, we conclude that the death sentence is proportionate in this case.
IV. CONCLUSION
For the reasons expressed above, we affirm Snelgrove’s sentences of death for the murders of Glyn and Vivian Fowler.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

N.3. In the attic of the Snelgrove home, the police discovered a bag with two bloody t-shirts. The bag smelled of ammonia. Blood samples from the t-shirts matched Snelgrove’s DNA profile. Two pairs of blood-stained shorts were also found in the Snelgrove home. Blood samples from the shorts revealed a mixture of DNA: Snelgrove was determined to be the primary contributor; the testing was unable to exclude Jeff McCrae as a possible secondary contributor.

. In preparation for his first trial, Snelgrove completed the revised Weshler Adult Intelligence Scale (WAIS-R) test and scored a 78, within the "borderline range of intellectual functioning" and above the retarded range.

. On cross-examination, Dr. Berland clarified that he did not seek any information from Snelgrove or law enforcement regarding the crime and did not have the information necessary to form a causal link between Snel-grove’s psychosis and the crime.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. This Court has "consistently interpreted this definition to require a defendant seeking exemption from execution to establish he has an IQ of 70 or below." Nixon v. State, 2 So.3d 137, 142 (Fla.2009).

. This evidence was considered by the trial court and ultimately supported a mitigator on Snelgrove’s "somewhat limited level of intelligence.”

. In a related claim, Snelgrove argues that Florida’s mental retardation standard is unconstitutional. However, we have repeatedly rejected Snelgrove's argument that a firm IQ cut-off score of 70 or below is unconstitutional, see, e.g., Franqui v. State, 59 So.3d 82, 92-94 (Fla.2011), and Snelgrove failed to preserve for appeal his equal protection argument, see Doorbal, 983 So.2d at 492 ("For an issue to be preserved for appeal, it must be presented to the lower court, and the specific legal argument or ground to be argued on appeal must be part of that presentation.”). We decline to address Snelgrove’s claim that the statute’s clear and convincing evidence standard is unconstitutional because the trial court specified that Snelgrove failed to establish mental retardation under either the clear and convincing standard or the preponderance of the evidence standard. See Nixon, 2 So.3d at 145.

. In its order rejecting the mental retardation claim, the trial court found the expert for the prosecution to offer the more credible explanation — that Snelgrove was likely tested and determined not to be retarded because it would have been illegal to place a retarded child in EMO classes.

. Snelgrove also argues that the prosecution committed a discovery violation by providing the redacted video late in the trial and that he should have received a continuance in order to review the video. But it is undisputed that Snelgrove received a copy of the video without redactions at the original trial, reviewed the redacted version prior to its introduction, and was given additional time to view the video in and out of court and to prepare for its introduction. Snelgrove has waived his claim that the video was "materially changed” by the redactions because Snel-grove failed to offer any argument to support this assertion, either to this Court or to the trial court. See Kearse v. State, 969 So.2d 976, 990 (Fla.2007).

. Snelgrove also argues that the trial court should have considered, for puiposes of the impaired capacity mitigator, evidence of brain damage, impulse control problems, biological brain malfunction, and low IQ. In fact, the trial court did consider this information; in its sentencing order, the trial court discussed Snelgrove’s mental problems, "abnormal brain function,” and "limited intelligence,” yet found that these problems did not substantially impair Snelgrove's capacity. Additionally, there was no testimony describing the relationship of this evidence to Snel-grove’s capacity.